Rhonda 



 NO. 12-01-00372-CV



IN THE COURT OF APPEALS
 


TWELFTH COURT OF APPEALS DISTRICT



TYLER, TEXAS


POLARIS INDUSTRIES, INC., AND
§
 APPEAL FROM THE 273RD

AND RANDY BALLARD d/b/a

AMERICAN OUTDOOR POWER,

APPELLANTS


V.
§
 JUDICIAL DISTRICT COURT OF




LARRY MCDONALD,

APPELLEE
§
 SHELBY COUNTY, TEXAS

 

OPINION


 Polaris Industries, Inc. and Randy Ballard d/b/a American Outdoor Power (sometimes
collectively referred to as "Polaris") bring this interlocutory appeal from a class certification order in
which the trial court certified a class premised upon breaches of the implied warranty of merchantability
in the design of personal watercraft ("PWC" or "jet skis"). We reverse the trial court's judgment and
dismiss for want of jurisdiction. 

 

Background

 Polaris designs, manufactures and markets motorized products for recreation and utility use,
including snowmobiles, motorcycles, all-terrain vehicles and PWC. American Outdoor Power is a
Polaris dealership. The engine of a PWC is directly coupled to a drive shaft which, when running,
rotates an impeller. The impeller is situated where surface water is drawn up and underneath the
watercraft. The water travels through the impeller and is accelerated, producing a thrust to move the
watercraft forward. Squeezing the throttle level increases engine speed. Turning the handlebar pivots
the jet pump nozzle and controls the direction of the PWC. The throttle must be applied in order to turn
the PWC. This feature is unlike a conventional boat which uses a rudder to control direction. PWC
do not have rudders, propellers or any comparable device protruding into the water from the bottom of
the machine. PWC do not have brakes. In this respect, they are like other boats. The customary way
to stop the machine is to cut the power and let it glide to a stop. 

 Named plaintiff Larry McDonald ("McDonald") sued Polaris claiming that Polaris PWC's lack
of adequate collision avoidance capabilities - they have no design features that would provide the
operator with steering or maneuvering capability in off-throttle or off-power operating condition -
causes the PWC to be defective, unmerchantable and unfit for their ordinary purposes because of
inherent design inadequacies in the operating characteristics of the craft. He asserts causes of action
for breach of the implied warranty of merchantability and violation of the Magnuson-Moss Act, and
asks for the cost of repair, replacement or the amount representing the loss in value of the PWC
attributable to the presence of the alleged inadequacies. McDonald filed his suit as a class action on
behalf of all persons similarly situated who purchased a new Polaris personal watercraft in the United
States on or after May 5, 1995, manufactured or distributed by the Polaris Defendant and sold by and
through its authorized dealers such as American Outdoor Power. 

 After a certification hearing, the trial court defined the class as follows:


 All persons and entities who purchased new Polaris personal watercraft from dealers in the State
of Texas after May 4, 1995 and who still own their Polaris personal watercraft as of the date of this Order
Certifying Class.

 The Class shall not include:

 . . . .

 2. New Polaris personal watercraft purchasers who have suffered personal injury as a result of
the operation of their Polaris personal watercraft;

 3. New Polaris personal watercraft purchasers who have sustained damage to property other than
their Polaris personal watercraft as a result of their of[sic] operation of their Polaris personal watercraft.

 . . . .



Polaris has sold over 12,000 PWC in Texas during the period of time included in the class definition.



Implied Warranty of Merchantability

 McDonald has pleaded a cause of action against Polaris for breach of the implied warranty of
merchantability with respect to the design of the Polaris personal PWC which he purchased from
American Outdoor Power. The implied warranty of merchantability is codified in the Texas Business
and Commerce Code. The elements of a cause of action for breach of the implied warranty of
merchantability are as follows: 1) the defendant sold or leased a product to the plaintiff; 2) the product
was unmerchantable; 3) the plaintiff notified the defendant of the breach; and 4) the plaintiff suffered
injury. Tex. Bus. & Com. Code Ann. §§ 2.314, 2.314 cmt. 13, 2.607(c)(1), 2.714, 2.715 (Vernon
1994). 

 The Texas Business & Commerce Code provides a nonexclusive list of the minimum criteria
required for a product to be unmerchantable. First, a product is considered unmerchantable if it cannot
pass without objection in the trade. Tex. Bus. & Com. Code Ann. § 2.314(b)(1) (Vernon 1994). To
pass without objection, a product must be of a quality comparable to other products that are sold in that
line of trade under the contract description. Harris Packaging Corp. v. Baker Concrete Constr. Co.,
982 S.W.2d 62, 65-66 (Tex. App.-Houston [1st Dist.] 1998, pet. denied) (plaintiff did not show that
other manufacturers of similar goods placed warning label on their product); Fitzgerald v. Caterpillar
Tractor Co., 683 S.W.2d 162, 163-64 (Tex. App.-Fort Worth 1985, writ ref'd n.r.e.)(defendant
established the design of forklift sold to plaintiff was same design used by all manufacturers throughout
the world). Second, a product is considered unmerchantable if it is unfit for ordinary purposes. Tex.
Bus. & Com. Code Ann. § 2.314(b)(3) (Vernon 1994). For a product to be unfit for ordinary purposes,
it must have a defect, i.e., the product lacks something necessary for adequacy. Plas-Tex, Inc. v. U.S.
Steel Corp., 772 S.W.2d 442, 444 (Tex. 1989). A product can lack something necessary for adequacy
when it does not accomplish the purposes for which it was manufactured, or when it is constructed in
a manner which makes it "unreasonably dangerous." See, e.g., Hyundai Motor Co. v. Rodriguez, 995
S.W.2d 661, 665 (Tex. 1999)(design of car's restraint system that caused passenger to be thrown into
the roof was unfit for its ordinary purpose); Church & Dwight Co. v. Huey, 961 S.W.2d 560, 569 (Tex.
App.-San Antonio 1997, pet. denied)(substance to remove paint was not fit for its ordinary purpose
because it could not be rinsed away). And third, a product is considered unmerchantable if it does not
conform to the promises or affirmations of fact which are on the product's container or label. Tex. Bus.
& Com. Code Ann. § 2.314(b)(6) (Vernon 1994). After a product is shown to be unmerchantable, a
plaintiff must then establish that the defect caused him to suffer injury. Rodriguez, 995 S.W.2d at 667-68. 

 In an action for breach of the implied warranty of merchantability, the plaintiff can recover
actual damages. Actual damages include direct damages, which are measured by the difference between
the value of the goods accepted and the value of the goods if they had been as warranted. Tex. Bus.
& Com. Code Ann. § 2.714(b) (Vernon 1994); Signal Oil & Gas Co. v. Universal Oil Prods., 572
S.W.2d 320, 327 (Tex. 1978). Actual damages also include incidental and consequential damages, such
as foreseeable lost profits, personal injury, and property damage caused by the breach. Tex. Bus. &
Com. Code Ann. § 2.715(b) (Vernon 1994); Garcia v. Texas Instruments, 610 S.W.2d 456, 462 (Tex.
1980); Signal Oil & Gas Co., 572 S.W.2d at 326. 

 The defendant can assert the defense that the dangers of the goods are common knowledge in
the community, and thus the implied warranty of merchantability does not apply. See, e.g., American
Tobacco Co. v. Grinnel, 951 S.W.2d 420, 435 (Tex. 1997)(no implied warranty of merchantability
applied because health dangers of cigarettes commonly known). Also, when the plaintiff has examined
the goods before entering into the contract or has refused to examine the goods, there is no implied
warranty of merchantability for defects that an examination should have revealed. Tex. Bus. & Com.
Code Ann. § 2.316(c)(2) (Vernon 1994). 


Magnuson-Moss Warranty Act

 McDonald has also pleaded a cause of action against Polaris arising under the Magnuson-Moss
Warranty Act, 15 U.S.C.A. §§ 2301-2312 (West 1982)("the Act"). The Act regulates written warranties
and provides a private right of action by consumers against manufacturers or retailers who fail to
comply with written warranties or implied warranties. The Act does not preempt Texas law on warranty
liability unless a Texas statute conflicts with the provisions of the Act. See Murphy v. Mallard Coach
Co., 179 A.D.2d 187, 192, 582 N.Y.S.2d 528, 531 (1992). Importantly, the Act specifically provides
that state law determines whether or not an implied warranty exists. See 15 U.S.C.A. § 2301(7) (West
1982).

 The Act states that "a consumer who is damaged by the failure of a supplier, warrantor or service
contractor to comply with any obligation under [the Act] or under a written warranty, implied warranty
or service contract, may bring suit for damages and other legal and equitable relief." See 15 U.S.C.A.
§ 2310(a)(3), (d)(1) (West 1982). The Act provides consumers a federal cause of action for breach of
an implied warranty of merchantability or fitness for a particular purpose whether or not a written
warranty is involved in the transaction. Royal Lincoln Mercury Sales, Inc. v. Wallace, 415 So.2d
1024, 1026-27 (Miss. 1982). However, the federal cause of action for breach of an implied warranty
allowed by the Act will only be sustainable if a breach can be proved under the applicable state law. 
Feinstein v. Firestone Tire & Rubber Co., 535 F.Supp. 595, 605 (S.D.N.Y. 1982). Consequently, the
alleged breach of the implied warranty of merchantability under Texas law provides McDonald not only
with a potential cause of action under the Texas Business & Commerce Code, but also a federal cause
of action under the Magnuson-Moss Act. But if there is no implied warranty of merchantability, or a
breach thereof, McDonald cannot be successful in his claim under the Act.


Class Certification

 An appellate court should reverse a trial court's certification order only if the record shows that
the trial court committed a clear abuse of discretion. E&V Slack, Inc. v. Shell Oil Co., 969 S.W.2d
565, 567 (Tex. App.- Austin 1998, no pet.). An abuse of discretion occurs if the trial court acts without
reference to any guiding principles or acts arbitrarily or unreasonably. Downer v. Aquamarine
Operators, Inc., 701 S.W.2d 238, 242 (Tex. 1985). We will find that a trial court does not abuse its
discretion if it bases its decision on conflicting evidence. Tana Oil & Gas Corp. v. Bates, 978 S.W.2d
735, 741 (Tex. App.-Austin 1998, no pet.). But a failure to analyze or apply the law correctly is an
abuse of discretion. Huie v. DeShazo, 922 S.W.2d 920, 927-28 (Tex. 1996); Walker v. Packer, 827
S.W.2d 833, 840 (Tex. 1992). Also, when a trial court's ruling is based on factual assertions not
supported by material in the record, we will find an abuse of discretion. State Farm Mut. Auto. Ins.
Co. v. Lopez, 45 S.W.3d 182, 186 (Tex. App.-Corpus Christi 2001, pet. dism'd w.o.j.). An appellate
court, in reviewing a trial court's refusal to certify, should not err in favor of certification. See
Southwestern Ref. Co. v. Bernal, 22 S.W.3d 425, 434-35 (Tex. 2000). Although the ultimate issue at
the trial court level is whether the defendant breached the implied warranty of merchantability, the
question before us is whether the propriety of its conduct can and should be decided on a class-wide
basis. 


 Trial courts must be able to look beyond the pleadings to make a reasoned inquiry of the certification
issues because class determinations involve considerations enmeshed in the legal and factual issues that
comprise the plaintiffs' claims. Moreover, with respect to predominance, the "most stringent" of the rule
42(b)(4) requirements, Bernal also requires the trial court to identify the dispositive substantive issues
in the case.


Union Pacific Resources Group, Inc. v. Neinast, 67 S.W.3d 275, 283-84 (Tex. App.-Houston [1st
Dist.] 2001, no pet.). To make a proper analysis, "going beyond the pleadings is necessary, as a court
must understand the claims, defenses, relevant facts, and applicable substantive law in order to make
a meaningful determination of the certification issues." Castano v. American Tobacco Co., 84 F.3d
734, 742 (5th Cir. 1996). 

Standing in "No-Injury" Cases 

 It is axiomatic that standing is the first prerequisite to maintaining a suit. Hunt v. Bass, 664
SW.2d 323, 324 (Tex. 1984). That an action is a class action has no effect on that prerequisite. The
M.D. Anderson Cancer Center v. Novak, 52 S.W.3d 704, 708 (Tex. 2001). Persons have standing to
sue if they can show that (1) they have sustained some direct injury as a result of a wrongful act; (2)
there is a direct relationship between their alleged injury and the claim sought to be adjudicated; (3) they
have a personal stake in the controversy; (4) the challenged action has caused them an injury in fact,
whether economic, recreational, environmental or otherwise; or (5) they are appropriate parties to assert
the public's interest in a matter, as well as their own. Dresser Industries, Inc. v. Snell, 847 S.W.2d
367, 376 (Tex. App.-El Paso 1993, no writ). Because standing is a jurisdictional requirement, it may
be addressed for the first time on appeal. (1) Sierra Club v. Cedar Point Oil Co., 73 F.3d 546, 555 n.22
(5th Cir. 1996); Texas Ass'n of Business v. Texas Air Control Bd., 852 S.W.2d 440, 445 (Tex. 1993). 
 In Novak, the proposed class representative complained that M.D.Anderson sent out letters
soliciting donations which stated that "well over 50 % of people with cancer who are cared for at the
University of Texas M.D. Anderson Cancer Center return home cured." Novak, 52 S.W.3d at 706. 
Although the named plaintiff did not contribute any money in response to the letter, he sued
M.D.Anderson contending that the cure-rate representation was false and that the cancer center and
various doctors conspired to fraudulently induce the recipients of the letter to contribute money. Id. 
The supreme court held that because the named plaintiff was unable to allege and show that he
personally had been injured by the defendants' actions, his lack of individual standing precluded the
trial court's exercise of subject matter jurisdiction. Id. at 708. The court explained that 


 [o]ur state constitution contemplates that plaintiffs seeking redress in the courts must first demonstrate
standing. Because the Texas Constitution requires the presence of a proper party to raise issues before
the Court, standing is a threshold inquiry regardless of whether the plaintiff brings an individual or a class
action.



Id. at 710. The supreme court concluded that in order to demonstrate standing, "[a] named plaintiff in
a class action must show that the threat of injury . . . is 'real and immediate,' not 'conjectural' or
'hypothetical.'" Novak, 52 S.W.3d at 710 (quoting Sosna v. Iowa, 419 U.S. 393, 402-03, 95 S. Ct. 553,
559, 42 L. Ed. 2d 532 (1975)).

 If we look to federal case law, it is clear that when appellate courts review class certifications
in "no-injury" cases like this one, they must to some extent look at the merits of the case. "Typically,
. . . the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain
whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." Allen
v. Wright, 468 U.S. 737, 752, 104 S. Ct. 3315, 3325, 82 L. Ed. 2d 556 (1984). A recent example is
Rivera v. Wyeth-Ayerst Laboratories, 283 F.3d 315 (5th Cir. 2002), in which the named plaintiff
alleged that the defendant failed to warn of the dangers of a drug and that the drug was defective, a
breach of the implied warranty of merchantability. Id. at 317. She sought to represent all patients who
were prescribed, had purchased, and had ingested a medication but suffered no physical or emotional
injury. Id. She asserted an "economic injury" - the cost of the drug. Id. The class explicitly excluded
any patients who had been injured by the medication. Id. The Fifth Circuit held that the suit did not
present a justiciable case or controversy since the named plaintiff did not demonstrate an injury. Id. at
320-21. 

 Another federal case, In re Air Bag Prods. Liab. Litig., 7 F.Supp.2d 792 (E.D.La. 1998),
illustrates the same philosophy. In Air Bag Prods., named plaintiffs brought a class action suit against
automobile manufacturers and dealers alleging that their driver or passenger-side airbags were defective
because they were designed to deploy with sufficient speed and force to seriously injure or kill front seat
occupants. Id. at 795. None of the named plaintiffs alleged that a single air bag functioned improperly
under normal use nor alleged manifest injury. Instead, they pleaded that, taking into account the alleged
defect, the value of their vehicles was less than what they paid. Id. at 796. One of their numerous
causes of action was predicated upon a breach of the implied warranty of merchantability as defined by
Texas law. Id. The trial court dismissed the case, stating that "given that no manifest injury has been
shown, plaintiffs' argument that the air bags pose not just inconvenience but lethal risk simply has no
persuasive force." Id. at 806 n.21. The court went on to explain that "the absence of manifest injury
is so fundamental a deficiency in tort or implied warranty claims that such claims are more
appropriately dismissed than preserved." Id. at 804.

Analysis

 In May of 1995, McDonald purchased two Polaris PWC from American Outdoor Power. 
McDonald signed a warranty registration form which stated that "the dealer has explained to me Polaris'
warranty and that it is dangerous to use the vehicle before reading all warnings and safety instructions
in the owner's manual." But he admittedly did not read the Owner's Safety and Maintenance Manual
before operating the machines. He also received a video from the dealer which he understood was an
instructional tool, but did not watch it. McDonald agreed that his PWC had safety-warning decals on
them which warned that the PWC did not have brakes and that they could not be steered without
applying the throttle. Both he and all members of his family had read the decals. He could not think
of any other warning which Polaris should have put on the machines. McDonald admitted that he knew
the operation of the PWC was risky even before he purchased them.

 McDonald conceded that neither he nor any member of his family had suffered an injury because
of the alleged defect. Nor did he know of anyone else who had. He and his family had been using the
PWC for six summers, and for five of those summers his children used them without an adult riding
with them. At the time of his deposition, he had no plans to discontinue using the PWC. Although he
knew they were "dangerous" and "defective," he had not gone to the dealer to inquire about add-on
features which would make his PWC safer. 

 The case before us involves a product that functions precisely as warranted, but which
McDonald contends could be made safer by modifications to the product. His legal theory is that all
makes and models of PWC designed, manufactured and marketed by Polaris since May 1995 are
inherently defective and unmerchantable because of identical inadequacies in the collision avoidance
capabilities of these craft that have resulted in almost identical damages suffered by each class member
or entitlement to identical repair or replacement remedies. In McDonald's First Amended Petition, he
describes the injury to himself and to putative class members as the loss of value of each PWC caused
by the lack of collision avoidance capability and a passenger kill-switch on the Polaris PWC. He
admitted in his deposition that neither he nor anyone else, to his knowledge, has ever been injured by
the lack of off-throttle steering and braking. Importantly, he never averred that he got less than what
he paid for - just that he would have paid more for the safety features if given the opportunity. (2) This
case is almost identical to both Rivera and Air Bag Prods. In Rivera, the named plaintiff purchased
the defective medicine but was not harmed by it. She got what she paid for - an effective pain killer. 
In Air Bag Prods., the named plaintiffs purchased vehicles with airbags which were allegedly defective. 
They got what they paid for - automobiles which provide transportation. In the case before us,
McDonald bought the PWC, but sustained no injury due to its alleged defects. He got exactly what he
paid for - a water vehicle fit for recreational use. 

 The measure of breach-of-warranty damages is the difference between the market value of
property as warranted and the market value of property as delivered. Sweco, Inc. v. Continental Sulfur
& Chem., 808 S.W.2d 112, 117-18 (Tex. App.-El Paso 1991, writ denied). The price agreed on by the
parties to the sale of personal property may be taken as the market value of that for which the parties
contracted. Chrysler Corp. v. Schuenemann, 618 S.W.2d 799, 805 (Tex. Civ. App.-Houston [1st
Dist.] 1981, writ ref'd n.r.e.). Since there is no dispute that McDonald purchased a PWC which was
warranted as a product with no off-throttle steering or braking system, there can be no dispute that there
was no difference in the market value of the PWC as warranted and the market value of the personal
property as delivered; thus, McDonald suffered no injury. 

 McDonald argues that the lack of any concrete injury is not definitive of the issue of class
certification. He cites Microsoft Corp. v. Manning, 914 S.W.2d 602, 605 (Tex. App.-Texarkana 1995,
writ dism'd), in which the court upheld the certification of a class action for breach of the implied
warranty of merchantability of MS-DOS 6.0, software designed by Microsoft. The class was certified
even though relatively few people, about three in 1,000, lost data after using the software in question. 
Most users lost no data and thus sustained no damage. Id. We distinguish Manning from the case
before us because the court was not discussing standing, but the issue of damages. All parties agreed
that there was a defect in the product which could potentially cause harm. They also agreed that
Microsoft had released MS-DOS 6.2 to correct the problems associated with the product. And it was
undisputed that the remedy, MS-DOS 6.2, cost $9.95. Thus, the MS-DOS 6.0 software's value was,
in fact, $9.95 less because of its defect. 

 Such is not the situation in the case before us. The Beaumont court has explained and
distinguished injury and damages in a software context from that of automotive cases.


 Software . . . is not like tires or cars. Tires and cars have a distinctly limited usable life. At the end of the
product's life, the product and whatever defect it may have had pass away. If a defect does not manifest
itself in that time span, the buyer has gotten what he bargained for. Software's useful life, however, is
indefinite. Even though the defect is not manifest today, perhaps because the user is not using the data
compression feature, it may manifest itself tomorrow. The only way for an MS-DOS 6.0 buyer to avoid
the possibility of injury is to pay for the upgrade, never use the data compression feature, or use another
operating system. The buyer never gets what he bargained for, i.e., an operating system with an effective
data compression feature.


Compaq Computer Corp. v. Lapray, 79 S.W.3d 779, 792 (Tex. App.-Beaumont 2002, pet. granted). 
Microsoft can be distinguished from PWC cases in the same way. 

 Further, McDonald admitted that he examined the PWC before entering into the contract and
that the warning decals clearly stated that the jet skis had no off-throttle steering or braking capabilities. 
He also chose not to read the owner's manual or watch the video which would have reiterated the need
for caution in operating the PWC. As we stated earlier, there is no implied warranty of merchantability
for defects that an examination should have revealed.

 It was error, therefore, to conclude that McDonald had standing to bring implied warranty and
Magnuson-Moss Act claims on behalf of himself or a class of persons similarly situated. We sustain
Polaris' first issue, reverse the trial court's judgment and render judgment dismissing the suit for want
of jurisdiction. 

 

Rule 42

 Recognizing that no other Texas court has held that standing is an issue in implied warranty suits
where no plaintiff has suffered a concrete injury, we will continue our analysis of some of the 42(b)
issues which support decertification. Under Rule 42, all class actions must satisfy four requirements:
1) numerosity ("the class is so numerous that joinder of all members is impracticable"); 2) commonality
("there are questions of law or fact common to the class"); 3) typicality ("the claims or defenses of the
representative parties are typical of the claims or defenses of the class"); and 4) adequacy of
representation ("the representative parties will fairly and adequately protect the interests of the class"). 
Tex. R. Civ. P. 42(a).

 If the 42(a) elements are satisfied, the trial court must then determine if the class action is
maintainable. Tex. R. Civ. P. 42(b). There are four subsections of 42(b), at least one of which must
be satisfied before class certification is appropriate:



 the prosecution of separate actions by or against individual members of the class would create
a risk of


 

 (A) inconsistent or varying adjudications with respect to individual members of the
class which would establish incompatible standards of conduct for the party opposing
the class, or


 (B) adjudications with respect to individual members of the class which would as a
practical matter be dispositive of the interests of the other members not parties to the
adjudications or substantially impair or impede their ability to protect their interests;
or



 the party opposing the class has acted or refused to act on grounds generally applicable to the
class, thereby making appropriate final injunctive relief or corresponding declaratory relief with
respect to the class as a whole; or




 where the object of the action is the adjudication of claims which do or may affect specific
property involved in the action; or

 the court finds that the questions of law or fact common to the members of the class predominate
over any questions affecting only individual members, and that a class action is superior to other
available methods for the fair and efficient adjudication of the controversy.



Tex. R. Civ. P. 42(b) (emphasis added). McDonald seeks certification under (4).

Predominance

 In its fourth issue, Polaris asserts that individual questions affecting only individual members
predominate over questions of law or fact common to the members of the class. The "predominance
requirement . . . is one of the most stringent prerequisites to class certification." Bernal, 22 S.W.3d at
433. Under Rule 42, "common" questions must predominate over questions affecting only individual
class members. Tex. R. Civ. P. 42(b)(4). Common questions are those "questions of law or fact
common to the class." Sun Coast Resources, Inc. v. Cooper, 967 S.W.2d 525 (Tex. App.-Houston
[1st Dist.] 1998, pet. dism'd w.o.j.). A common question exists when the answer as to one class
member is the same as to all. Spera v. Fleming, Hovenkamp & Grayson, P.C., 4 S.W.3d 805, 810
(Tex. App.-Houston [14th Dist.] 1999, no pet.). Common questions that do not produce common
answers do not satisfy Rule 42. Wente v. Georgia-Pacific Corp., 712 S.W.2d 253, 257 (Tex.
App.-Austin 1986, no writ). 

 Courts determine if common issues predominate by identifying the substantive issues that will
control the outcome of the litigation, assessing which issues will predominate, and determining if the
predominating issues are, in fact, common to the class. Bernal, 22 S.W.3d at 434. The purpose of this
requirement is to determine whether the character and nature of the case satisfy the requirements of the
class action procedural rule. Graebel/Houston Movers, Inc. v. Chastain, 26 S.W.3d 24, 33 (Tex.
App.-Houston [1st Dist.] 2000, pet. dism'd w.o.j.). The trial court must then correctly identify the
elements of the plaintiff's causes of action. Henry Schein, Inc. v. Stromboe, 46 Tex. Sup. Ct. J. 103,
114, 2002 Tex. LEXIS 178 *47 (Oct. 31, 2002). The next step for the court is to "decide before
certifying a class, after rigorous analysis and not merely a lick and a prayer, . . . whether the plaintiffs
have demonstrated that they can meet their burden of proof in such a way that common issues
predominate over individual ones." Id. The test for predominance is not whether common issues
outnumber uncommon issues, but whether common or individual issues will be the subject of most of
the litigants' and the court's efforts. Bernal, 22 S.W.3d at 434. If, after common issues are resolved,
presenting and resolving individual issues is likely to be an overwhelming or unmanageable task for a
single jury, then common issues do not predominate. Id. Ideally, a judgment in favor of the named
plaintiff should decisively settle the entire controversy, and all that should remain is for other class
members to file proofs of claim. Id. 

Analysis

 Section 2.316 of the Texas Business and Commerce Code states that there is no implied
warranty of merchantability with regard to defects when the buyer, before entering into the contract, has
examined the goods or the sample or model as fully as he desired or has refused to examine the goods
and, under the circumstances, the examination would have revealed the defect to him. Tex. Bus. &
Com. Code Ann. § 2.316(c)(2) (Vernon 1994). Also, comment 8 under section 2.316 states that "the
particular buyer's skills and the normal method of examining goods in the circumstances determine
what defects are excluded by the examination." Tex. Bus. & Com. Code Ann. § 2.316 cmt. 8 (Vernon
1994). In other words, for the court to determine whether an implied warranty exists, there has to be
an individualized inquiry of each consumer as to his particular circumstances and knowledge when he
purchased the jet ski. The actions and the knowledge of each buyer and the actions of the seller
determine whether or not the product even has an implied warranty. Every aspect of the transaction
must be considered, and these factors would vary from individual to individual. For example, was the
consumer given the opportunity to fully inspect the PWC? Did the salesperson insist that the consumer
inspect the PWC before purchasing it? Did the consumer refuse to inspect? Were there warning decals
on the PWC at the time the consumer inspected it? Had a putative class member already owned or used
a PWC in the past, and become aware of the lack of an off-throttle steering and braking system? Did
the salesperson carefully explain to the buyer that he would have to use the throttle in order to steer? 

 Before a court determines if there is a defect in a product which breached an implied warranty,
it must first decide if there is an implied warranty to be breached. All of the questions above, plus many
more, are crucial to a determination of the existence of an implied warranty of merchantability. Where
a key question is the actual knowledge of each class member at the time of the transaction in dispute,
so that the "state of mind of every single class member" must be considered at trial, then individual
issues will always predominate and preclude certification. West Teleservices, Inc. v. Carney, 75
S.W.3d 455, 462 (Tex. App.-San Antonio 2001, no pet.). We have recently held that such a subjective
and individualized inquiry is a constitutional prerequisite to the maintenance of many individualized
claims brought in the class action context. Peltier Enterprises, Inc. v. Hilton, 51 S.W.3d 616, 625
(Tex. App.-Tyler 2001, pet. denied)("Due process requires that Peltier and the Bank be permitted to
take appropriate discovery of absent class members and to present evidence at trial reasonably
calculated to defeat the class members' claims."). Therefore, a court must receive individual evidence
regarding each individual sale. An implied warranty claim is individual to each person; thus, common
issues rarely predominate over individual issues and the predominance requirement is not satisfied. 

Superiority

 In its fifth issue, Polaris alleges that because of collateral estoppel issues, a class action is
inferior and unmanageable when compared to "traditional" litigation. Polaris also argues that the
United States Coast Guard is the superior forum to resolve this case. 

 A class action is superior to other methods of adjudication where any difficulties which might
arise in the management of the class are outweighed by the benefits of classwide resolution of common
issues. See Weatherly v. Deloitte & Touche, 905 S.W.2d 642, 654 (Tex. App.-Houston [14th Dist.]
1995, writ dism'd w.o.j.). In assessing the superiority of a class action, the court should consider (A)
the interest of members of the class in individually controlling the prosecution or defense of separate
actions; (B) the extent and nature of any litigation concerning the controversy already commenced by
or against members of the class; (C) the desirability or undesirability of concentrating the litigation of
the claims in the particular forum; and (D) the difficulties likely to be encountered in the management
of a class action. See Tex. R. Civ. P. 42(b)(4). Additionally, the trial court may consider whether
traditional litigation is not economically feasible, whether class members would benefit from discovery
already commenced, and whether the court has invested time and effort in familiarizing itself with the
issues in dispute. General Motors Corp. v. Bloyed, 916 S.W.2d 949, 952 (Tex. 1996); Weatherly, 905
S.W.2d at 654. In other words, the court must consider alternative procedures for disposing of the
dispute and compare these to the judicial resources and potential prejudice to class members. Reserve
Life Ins. Co. v. Kirkland, 917 S.W.2d 836, 845 (Tex. App.-Houston [14th Dist.] 1996, no writ). 

Analysis

 We agree that the individual desires of class members are pertinent to the analysis of superiority,
but that "they should be subordinated to the advantages of having a defendants' liability determined in
one proceeding when virtually all legal and factual issues are common to the class members." Durrett
v. John Deer Co., 150 F.R.D. 555, 559 (N.D.Tex. 1993). As we previously discussed, however, we
cannot say that "virtually all legal and factual issues are common to the class members." 

 Further, we must consider the issue of collateral estoppel or claim preclusion as it applies to
putative class members. For an issue to be precluded by prior litigation, it must be shown that (1) the
facts sought to be litigated in the second action were fully and fairly litigated in the first action; (2) those
facts were essential to the judgment in the first action; (3) the parties were cast as adversaries in the first
action, and (4) the party against whom the doctrine is asserted must have been a party or in privity with
a party in the first suit. Sysco Food Servs., Inc. v. Trapnell, 890 S.W.2d 796, 801-02 (Tex. 1994). 
Privity connotes those who are in law so connected with a party to the judgment as to have such an
identity of interests that the party to the judgment represented the same legal right. Benson v. Wanda
Petroleum Co., 468 S.W.2d 361, 363 (Tex. 1971). Those in privity with a party may include persons
who exert control over the action, persons whose interests are represented by the party, or successors
in interest to that party. Getty Oil Co. v. Insurance Co. of N. Am., 845 S.W.2d 794, 800-01 (Tex.
1992). However, the party against whom collateral estoppel is asserted must always have had a full and
fair opportunity to litigate the issue in the prior suit. Eagle Properties, Ltd. v. Scharbauer, 807 S.W.2d
714, 721 (Tex. 1990). 

 Consider the following scenario: a consumer is a part of this class as currently defined and there
is a determination that there is no breach of the implied warranty of merchantability because there is
no defect. A year later, this same person injures himself because he is faced with an obstacle, he
intuitively lets off the throttle in order to stop, turns away from the obstacle, but runs into it anyway
because the PWC cannot be steered without using the throttle. In order to prevail against Polaris under
a breach of warranty or products liability theory and recover personal injury damages, he will have to
prove defect in design. However, that person will be collaterally estopped from maintaining that the
PWC was unreasonably dangerous due to a safety defect. (3) 

 Also, there are many consumers for whom it would be disadvantageous for a court to hold that
the lack of an off-throttle steering and braking system constituted a "defect." If a person wishes to sell
his PWC, he would have an obligation to disclose that it is a defective product, making the craft worth
less and impeding the transaction. We conclude that, based upon these considerations, there is a strong
interest in individual management of the cases. 

 Further, in 1971 Congress enacted the Federal Boat Safety Act ("FBSA"), 46 U.S.C.A. §§ 4301-4508 (West Supp. 2002), which vested the United States Coast Guard with exclusive authority to
regulate the design of PWC and other recreational boats. Currently, there is no federal requirement that
manufacturers equip PWC with any "collision avoidance system," including any off-throttle steering
or braking system. However, there is testimony from both sides that the Coast Guard is now engaged
in a review of the operation and design of PWC, including off-throttle steering, which may result in the
issuance of either a performance standard or a regulation requiring specific devices for off-throttle
steering. The Coast Guard has a continuing duty to recommend a recall of any watercraft that does not
conform to the safety standards developed by the Coast Guard through testing, inspection, investigation
and examination. See 46 U.S.C.A. § 4311(e) (West Supp. 2002). Consequently, when we consider the
alternative procedure of a Coast Guard investigation and possible recall and compare it to potential
prejudice to absent class members, we hold that a class action is not the superior method of resolving
this dispute.


Conclusion

 We conclude that McDonald has no standing to bring this cause of action. Accordingly, we
reverse the judgment of the trial court and dismiss the suit for lack of jurisdiction. We note, however,
that even if standing were present, the 42(b)(4) requirements of predominance and superiority have not
been satisfied, thus precluding certification of the class. 



 SAM GRIFFITH 

 Justice



Opinion delivered August 13, 2003.

Panel consisted of Worthen, C.J., Griffith, J., and DeVasto, J.



























(PUBLISH)
1. Polaris raised the standing issue for the first time on appeal. 
2. McDonald testified in his deposition that "if Polaris was aware of the patented brake and steering rudder,
Polaris should have made it aware to the consumer. If I had been let know that it was available as an option, I
would've took the option and paid the difference for the machine."
3. McDonald argues that there would be no preclusive effect if there is a finding on defect in this case
because the definition of "defect" is not the same for a strict liability case. We agree that it would not normally be,
but in a crashworthiness case, which the second suit would be, the concepts of defect in an implied warranty context
and in a products liability context are functionally the same. Rodriguez, 995 S.W.2d at 665 ("An uncrashworthy
vehicle cannot be unfit for ordinary use but not unreasonably dangerous, nor can it be unreasonably dangerous but fit
for ordinary use; it must be both or neither."). Thus, a finding of no defect in the case before us would preclude a
finding of defect in a second suit.