**WEST TELESERVICES, INC.**
**et al., Appellants,**

v.

**Richard CARNEY et al., Appellees.**

**No. 04–00–00853–CV.**

Court of Appeals of Texas,
San Antonio.

Nov. 7, 2001.

Rehearing Overruled Jan. 28, 2002.

Douglas W. Alexander, Julie A. Springer, Phyllis Pollard, Ray Donley, Scott, Douglass & McConnico, L.L.P., Austin, Nissa M. Sanders, Crofts & Callaway, P.C., San Antonio, for appellants.

Jeffrey A. Goldberg, Bernard Wm. Fischman, Mark Louis Greenwald, Richard Tinsman, Tinsman & Houser, Inc., San Antonio, for appellees.

Sitting: ALMA L. LÓPEZ, PAUL W. GREEN AND KAREN ANGELINI, Justices.

Opinion by KAREN ANGELINI, Justice.

This is an accelerated appeal in which West Teleservices, Inc. ("West"), West Telemarketing Corp. ("Inbound"), West Telemarketing Corp. Outbound ("Outbound"), and West Telemarketing Insurance Agency, Inc. ("Agency") appeal an order granting class certification to Richard Carney, Maria Elizabeth Baca, Mary K. Dub, and Mary D. Dub ("appellees"). Appellants request that this court reverse and remand the trial court's certification order.[1]

## BACKGROUND

Appellees, the class representatives, are employees of three telemarketing firms: Inbound, Outbound, and Agency.[2] Inbound employs telemarketing representatives ("TRs") to process incoming telephone orders from customers responding to items such as advertising and direct mail. Mary K. Dub and Mary D. Dub worked for Inbound as TRs. Outbound employs marketing representatives ("MRs") to market products and services by soliciting potential customers. Richard Carney and Maria Elizabeth Baca worked for Outbound as MRs. Agency employees verify and finalize sales of insurance products. Appellants charge fees to their corporate clients for the services of answering calls and soliciting sales of the clients' products.

In the underlying lawsuit, appellees allege that the three principal divisions of West, i.e. Inbound, Outbound, and Agency, require hourly employees to be present approximately ten to fifteen minutes prior to the commencement of their shift to receive instructions, hear "pep talks," and other information necessary to the day's work, but do not pay the employees for that time spent working. Specifically, upon arrival at work, the employees of all three divisions are required to "swipe in" with their employee identification card at a magnetic card reading device and computer timekeeping system known as Kronos.™ With regard to Outbound and Agency employees, Kronos™ records those employees as "present" at the time in which they swipe their cards, but they are not paid until the start of their shift. For payroll purposes, managers routinely alter the computer-recorded time sheets so as to "dock" the hourly employees for the minutes prior to the start of the shift recorded by Kronos.™ Appellants label this practice "correcting a long punch." [3]

With regard to Inbound employees, appellees allege that employees are also required to be present ten to fifteen minutes prior to the start of their shift. Kronos™ automatically rounds hourly employees' clock time to the nearest fifteen minutes. Accordingly, Kronos™ rounds up to the nearest quarter hour an employee's clock time, when the employee arrives one to

---

1. This is the second time appellants have appealed the trial court's certification of a class. In the prior appeal, we reversed and remanded the certification order, finding that the order did not comport with the requirements of *Southwestern Refining Co. v. Bernal*, 22 S.W.3d 425, 435 (Tex.2000). *See West Teleservices, Inc. v. Carney*, 37 S.W.3d 36, 42 (Tex. App.—San Antonio 2000, order). On remand, the trial court modified its certification order.

2. West is the parent company of Outbound and Agency. Inbound, Outbound, and Agency are independent companies, although Agency operates in the same facility as Outbound and employs Outbound to provide payroll services for it.

3. Outbound employees are paid the greater of their hourly wages for the week or the commissions they earned during the week. Thus, rounding time would not affect an employee who earned the greater amount in commissions.

seven minutes before the start of her shift. Likewise, Kronos™ rounds down to the preceding quarter hour an employee's clock time, when the employee arrives eight minutes or more before her shift begins. Kronos™ also rounds employee time to the nearest quarter hour when they "swipe out."

Appellants agree that Inbound, Outbound, and Agency round employee time as explained above. However, appellants assert that while all employees were required to be at their stations and ready to begin work at the start of their shift, no employees were required to be present before their shift, although they were "encouraged" to report to work early if they needed to take care of any personal business. Appellants maintain that employees were not expected nor required to perform compensable work between the time they clocked in and the start of their shift.

### THE CERTIFICATION ORDER

The modified certification order divides the class members into three sub-classes: (1) all present and former employees of West Telemarketing Corporation (Inbound Division) engaged as Telephone Representatives ("TR's") at any time between October 31, 1993 and the date of trial; (2) all present and former employees of West Telemarketing Corporation (Outbound Division) engaged as Marketing Representatives ("MR's") at any time between October 31, 1993 and the date of trial; and (3) all present and former employees of West Telemarketing Insurance Agency, Inc. engaged as Insurance Marketing Representatives ("Insurance Agents") at any time between October 31, 1993 and the date of

trial. The trial court identified the common issue to be tried for each sub-class as:

whether the hourly employees (MR's, TR's and Insurance Agents) performed valuable services for which they were not paid, under circumstances indicating that the employees expected to be paid and that the Defendant companies accepted the employees' services knowing that the employees expected to be paid.[4] These questions state causes of action under the doctrines of quantum meruit and restitution.

### STANDARD OF REVIEW

An appellate court reviews a trial court's determination that a case should be certified as a class action using an abuse of discretion standard. *West Teleservices, Inc. v. Carney*, 37 S.W.3d 36, 40 (Tex. App.—San Antonio 2000, no pet.); *Health & Tennis Corp. of Am. v. Jackson*, 928 S.W.2d 583, 587 (Tex.App.—San Antonio 1996, writ dism'd w.o.j.). The trial court abuses its discretion when it does not properly apply the law to the undisputed facts, when it acts arbitrarily or unreasonably, or when its ruling is based on factual assertions unsupported by the record. *West I*, 37 S.W.3d at 40; *Health & Tennis Corp.*, 928 S.W.2d at 587.

There is no automatic right to maintain a lawsuit as a class action. *West I*, 37 S.W.3d at 40; *Weatherly v. Deloitte & Touche*, 905 S.W.2d 642, 647 (Tex. App.—Houston [14th Dist.] 1995, writ dism'd w.o.j.). A trial court may certify a class action if the class proponent satisfies all four requirements of Texas Rule of

---

4. This issue tracks the Texas Pattern Jury Charge instruction for quantum meruit, which states that "[o]ne party performs compensable work if valuable services are rendered or materials furnished for another party who knowingly accepts them or uses them and if the party accepting them should know that the performing party expects to be paid for the work." STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES: BUSINESS, CONSUMER, EMPLOYMENT § 101.42 (2000).

Civil Procedure 42(a),[5] and at least one of the requirements under Rule 42(b). *West I*, 37 S.W.3d at 40; *Weatherly*, 905 S.W.2d at 647. In the instant case, appellees relied on Rule 42(b)(4), which requires the class representatives to show (1) that the factual or legal issues common to the class predominate over issues affecting only individual members, a criterion known as "predominance," and (2) that the class action is a superior method to fairly and efficiently adjudicate the controversy compared to other available methods, a criterion known as "superiority."

 Trial courts enjoy a broad range of discretion in determining whether to maintain a lawsuit as a class action, but may not consider the substantive merits of the class claims in making a determination. *West I*, 37 S.W.3d at 40; *Weatherly*, 905 S.W.2d at 647. Certification is not irreversible, and the trial court may alter, amend, or withdraw class certification at any time before final judgment. *West I*, 37 S.W.3d at 40; *Morgan v. Deere Credit, Inc.*, 889 S.W.2d 360, 365 (Tex.App.—Houston [14th Dist.] 1994, no writ); Tex.R. Civ. P. 42(c)(1). However, trial courts must perform a "rigorous analysis" before ruling on class certification to determine whether all the prerequisites to certifica-

tion are met. *Southwestern Refining Co. v. Bernal*, 22 S.W.3d 425, 435 (Tex.2000). This rigorous analysis includes indicating how the claims will likely be tried so that conformity with Texas Rule of Civil Procedure 42 can be meaningfully evaluated. *Id.* A court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues. *Id.*

## PREDOMINANCE OF INDIVIDUAL ISSUES

 Appellants present two issues: (1) that individual issues predominate over common issues and (2) that the court's trial plan is inadequate. Because predominance is "one of the most stringent prerequisites to class certification," we will address it first.[6] *Bernal*, 22 S.W.3d at 433. We determine "if common issues predominate by identifying the substantive issues of the case that will control the outcome of the litigation, assessing which issues will predominate, and determining if the predominating issues are, in fact, those common to the class." *Id.* at 434. The test for predominance is *not* whether common issues *outnumber* uncommon issues but "whether common or individual issues will

---

5. Rule 42(a) provides as follows:

 One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interest of the class.

 Tex.R. Civ. P. 42(a).

6. Appellants also argue that the class certification does not meet the commonality requirement of Rule 42(a). Rule 42(a) does not require that all, or even a substantial portion of the legal and factual questions be common

to the class. *Rainbow Group, Ltd. v. Johnson*, 990 S.W.2d 351 (Tex.App.—Austin 1999, pet. dism'd w.o.j.). Rule 42(b)(4) requires not only that there be common issues, but that common issues predominate over individual issues. *Bernal*, 22 S.W.3d at 435 (noting that "the predominance criterion is far more demanding than the commonality requirement" and that while the plaintiffs' shared experience might meet the commonality requirement and still fail to predominate over individual issues). There is no need to address the commonality requirement, because if the common issues do not predominate, the class should not be certified. Thus, the predominance and commonality inquiries are subsumed into one.

be the object of *most of the efforts* of the litigants and the court." *Id.* (citations omitted) (emphasis added). "If, after common issues are resolved, presenting and resolving individual issues is likely to be an overwhelming or unmanageable task for a single jury, then common issues do not predominate." *Id.* "Ideally, a judgment in favor of the class members should decisively settle the entire controversy, and all that should remain is for other members of the class to file proof of their claim." *Id.* (citations omitted) (internal quotation marks omitted). The predominance requirement "is intended to prevent class action litigation when the sheer complexity and diversity of the individual issues would overwhelm or confuse a jury or severely compromise a party's ability to present viable claims or defenses." *Id.*

 Quantum meruit is the only cause of action remaining in this case. Quantum meruit is an equitable theory of recovery which is based on an implied agreement to pay for benefits received. *Heldenfels Bros. v. City of Corpus Christi,* 832 S.W.2d 39, 41 (Tex.1992). Necessary elements of recovery under quantum meruit are: (1) valuable service was rendered or materials furnished, (2) to the party sought to be charged, (3) which were accepted by the party sought to be charged, and (4) under such circumstances as reasonably notified the recipient that the *plaintiff, in performing, expected to be paid by the recipient. Id.* Thus, no recovery can be had in quantum meruit where the plaintiff "had *actual knowledge and understanding* prior to" performing the services in question that he or she would not receive compensation. *General Homes, Inc. v. Denison,* 625 S.W.2d 794, 797 (Tex.App.—Houston [14th Dist.] 1981, no writ) (emphasis added).

 Appellants' primary defense in this case is that all of the class members had actual knowledge and understanding that they were not going to be paid for the period of time in question. Indeed all four appellees have admitted during their depositions that they had been told not to expect payment. Mary K. Dub testified during her deposition that she was told during her training class that the time clock would be rounded to the nearest fifteen minutes. "From day one until now," she understood that if she "clocked out at seven minutes after [the hour, she would not be] paid." Mary D. Dub gave deposition testimony that she learned about the rounding policy when she "read it in a policy manual or somewhere." According to Mary D. Dub, the policy manual stated that

> it was operating on a seven-minute clock at that point and that the time would be rounded, that if you clocked in prior to seven minutes before the start of your shift, it would be rounded back to the quarter, and if you clocked out prior to seven minutes after your shift, it would be rounded back. If you clocked out past the seven minutes, but before the quarter, say, or the half, then it would be rounded up to the quarter or the half.

Mary D. Dub believed, although she was not certain, that she read the manual sometime in 1995. Likewise, Maria Baca was asked during the certification hearing the following question: "But shortly after you started work, at least within the first couple of months, you knew that you were not being paid for that time between clock-in and the start of shift, correct?" Baca replied, "I would say that's correct." Carney also knew that he was not going to be paid for the time in question:

Q: And you knew that you were not going to be paid for the time between clock-in and the start of shift within two weeks of starting to work at West, correct?

A: I—I did not agree with it, but I—and I felt that it was wrong and I expressed it many times to many different managers, but after the second week, I would say, yes, I did know that I would not be getting paid for that time, but I knew of no remedy to force them to pay me for the time that I felt that I should be paid.

All four appellees also conceded that they would not be able to testify about whether any other class members knew that they were not going to be paid.

*Bernal* emphasized that although the class action is a procedural device intended to advance judicial economy, "convenience and economy must yield to a paramount concern for a fair and impartial trial." 22 S.W.3d at 437 (citation omitted). "[B]asic to the very essence of the adversarial process is that each party have the opportunity to adequately and vigorously present any material claims and defenses." *Id.* Appellants argue that to present their defense, they must be allowed to question every single class member regarding whether that employee had knowledge that he or she would not be paid for the period of time at issue. Thus, appellants contend that there is no common issue, but only individual issues that would require the jury to decide 90,000 mini-trials.[7]

Appellees respond that common issues predominate because "West's *policy* is uniform and affects *all* employees in a similar, measurable way." (emphasis in original). While the parties dispute whether the employees were required to be present prior to the start of their shift, appellees contend that "[i]t is sufficient that there is factual evidence that such a policy existed and that the workers lined up, punched

in," but did not receive payment for that time. Thus, appellees argue that plaintiffs do not have to establish the "state of mind" of every one of their co-workers to prove their claim of quantum meruit.

Appellees rely heavily on two cases: *Henry Schein, Inc. v. Stromboe*, 28 S.W.3d 196 (Tex.App.—Austin 2000, pet. dism'd w.o.j.) and *Rainbow Group, Ltd. v. Johnson*, 990 S.W.2d 351 (Tex.App.—Austin 1999, pet. dism'd w.o.j.). The facts in *Rainbow Group* are similar to the case at bar. Four hairstylists brought suit alleging that their employer breached an oral employment contract by preventing them from clocking in during hours for which they were scheduled to work and refusing to pay them for attending mandatory store meetings. 990 S.W.2d at 354. The Third Court of Appeals affirmed the certification of the class, noting that "in cases in which it appears that common issues *may* predominate over individual issues, the most efficient approach for the trial court is to certify the class, and, if necessary after the case has developed, *to dissolve or modify* the class if common questions do not predominate at trial." *Id.* at 360. *Bernal* specifically criticized this type of "certify now, worry later" approach. 22 S.W.3d at 435. Thus, *Rainbow Group* is no longer reliable precedent.

In *Stromboe*, a group of dentists brought breach of contract, breach of express and implied warranties, fraud, negligent misrepresentation, promissory estoppel, and violations of the Texas Deceptive Trade Practices—Consumer Protection Act claims against a seller of dental office management software, alleging that the software was defective. 28 S.W.3d at 199. The class was certified to include all pur-

---

7. The parties have estimated that there are approximately 90,000 potential class members.

chasers and/or persons who received the software. *Id.* at 200. The software seller appealed the certification order, arguing that individual issues of causation, reliance, and damages predominated over common issues. *Id.* at 203. The Third Court of Appeals held, however, that the common issues of the nature of the defects in the software, the extent of the defendant's knowledge of those defects, the defendant's alleged uniform misrepresentations about the software, and the defendant's alleged common scheme of sending and billing class members for unsolicited software would be the focus of most of the trial court's and parties' efforts. *Id.* at 205. Thus, the court of appeals held that the predominance requirement had been met. *Id.* at 208.

In the instant case, however, whether the individual class members had actual knowledge that they were not going to be paid will be an integral part of the appellees' defense. Given that the class representatives themselves have admitted that they had actual knowledge of the appellees' payment policies, it is apparent that the state of mind of every single class member is vitally important to the appellees' defense. Therefore, we hold that individual issues will predominate over common issues given the undisputed facts presented in this case. The trial court abused its discretion in granting certification.

As we have sustained appellants' first issue, we need not decide the merits of their second one.

## CONCLUSION

Because the individual issues presented in this case will predominate over common issues, we hold that the trial court abused its discretion in certifying the class. We reverse and remand this cause for proceedings consistent with this opinion.

ALMA L. LÓPEZ, J., dissents without opinion.