**COLLINS & AIKMAN FLOORCOVERINGS, INC., Appellant,**

v.

**James Bradley THOMASON d/b/a Contract Products Services Network, Appellee.**

No. 04–06–00550–CV.

Court of Appeals of Texas, San Antonio.

Feb. 27, 2008.

Supplemental Opinion April 2, 2008.

Sharon E. Callaway, Michael J. Murray, Crofts & Callaway, P.C., Richard G. Cedillo, Troy A. Glander, Davis, Cedillo & Mendoza, Inc., San Antonio, TX, for Appellant.

J. Ken Nunley, Kelly Putney Rogers, Nunley Davis Jolley Cluck Aelvoet L.L.P., Boerne, TX, for Appellee.

Sitting: ALMA L. LÓPEZ, Chief Justice, SANDEE BRYAN MARION, Justice, PHYLIS J. SPEEDLIN, Justice.

## OPINION

Opinion by: PHYLIS J. SPEEDLIN, Justice.

Collins & Aikman Floorcoverings, Inc. ("Collins & Aikman") appeals the trial court's judgment awarding Bradley Thomason d/b/a Contract Products Services Network $1,053,417.98 in damages based on his quantum meruit claim. Because we sustain Collins & Aikman's appellate issue as to damages, we suggest a remittitur of $526,773.03 of the damages awarded Thomason. If a remittitur is timely filed within twenty (20) days from the date of this opinion and judgment, the trial court's judgment as to liability is affirmed, its judgment as to damages is reformed and affirmed in the amount of $526,644.95, and its judgment as to attorney's fees and prejudgment interest is reversed and remanded for recalculation. If a remittitur is not timely filed, the trial court's judgment is reversed and the cause is remanded for a new trial.

### FACTUAL & PROCEDURAL BACKGROUND

Brad Thomason is a carpet broker who has been active in the carpet industry since 1986. Initially, he worked for Interface Carpet Company, and acquired many clients, including many State of Texas agencies, universities, and hospitals. He also developed a working relationship with Charles Bode at the Texas General Services Commission ("GSC"), which controls the carpet purchases made by the State. In 1993, the State of Texas decided to enter into a carpet contract with one particular dealer to streamline the process of buying carpet. Thomason, working with Bode, helped write the physical specifications for the various carpet products to be covered by the State contract; being employed by Interface at the time, Thomason positioned Interface products to meet the contract specifications. The first State carpet contract (the "1994 State Contract") was awarded to Green Carpet as the dealer, and the first order was taken in 1994.

In early 1995, Thomason left Interface and formed his own company, Contract Products Services Network ("CPS Network"), to act as a middleman between the carpet dealer under the State contract and the carpet manufacturers. Working with Green Carpet as the dealer who was awarded the 1994 State Contract, Thomason began developing relationships with other carpet manufacturers, including Mannington and Collins & Aikman. In February 1995, Thomason approached Collins & Aikman's regional manager David Grant and asked whether he would like to sell $1 million worth of carpet under the State contract. Grant agreed, and Thomason successfully convinced Bode at GSC that the higher quality Collins & Aikman

products could meet the 1994 State Contract specifications at the same price, thereby positioning Collins & Aikman on the contract.

From March 1995 through December 1995, Thomason wrote $1 million in business for Collins & Aikman under the 1994 State Contract. Not being an employee of Collins & Aikman, but an independent broker, Thomason was compensated through margins, or "commission earned rebates," which he earned by marking up the Collins & Aikman product that he sold to the dealer. For example, if the Collins & Aikman price quoted to the State for a particular product was $10, Thomason would mark it up $2 before selling it to Green Carpet as the dealer under the State contract; in turn, Green would mark the product up $4 before selling it to the State for the $16 price established by the 1994 State Contract. As his compensation, Thomason would receive his $2 mark-up, or margin, on the sale. This $2 margin was also referred to as the "pea" by the parties. Thomason earned an average 11.7% margin on all sales of Collins & Aikman products under the 1994 State Contract. Collins & Aikman had its own sales force, but Thomason was the only person selling Collins & Aikman's products under the State contract. In addition, Thomason trained Collins & Aikman employees on how the State contract worked, developed educational and sales tools for Collins & Aikman with respect to selling under the State contract, and provided his list of State clients.

In the spring of 1996, when it came time to bid on the second State contract to run from September 1996 to December 1999 (the "1996 State Contract"), Grant encouraged Thomason to similarly position Collins & Aikman's products on the contract and supplied Thomason with Collins & Aikman's new pricing and product information to assist him. Grant told Thomason, "you're our guy ... we don't have people who do what you do." Again, Thomason consulted with Bode in writing the new contract specifications to work to Collins & Aikman's advantage.

In addition, Thomason and Steve Whitener, who had left Green Carpet, decided to work together to help Gomez Floor Covering [1] win the bid as the dealer for the 1996 State Contract. On the night before the bid was due, May 1, 1996, Thomason and Whitener met and discussed forming a partnership to "run the contract" they expected to win. Thomason planned to contribute all of his margins (from Collins & Aikman, Mannington and other manufacturers) into the deal with Whitener, and, on the night before the bid, Thomason believed they had an agreement to share the dealer profits 50/50 from the 1996 State Contract; there was no written agreement.

In September 1996, Gomez Floor Covering did win the award as the dealer under the 1996 State Contract. Whitener promptly informed Thomason that there was no partnership, or other deal, between them. Despite Thomason's attempts at "working something out," no resolution between them was reached. Thomason stated that it was only after their agreement fell apart that he learned that Gomez Floor Covering was actually owned by Whitener's wife, Linda.

During the remainder of 1996, Thomason continued working with Collins & Aikman to position and sell its products under the new 1996 State Contract, and received

---

1. Gomez Floor Covering was a sole proprietorship run by Whitener's wife, Linda Gomez.

assurances from Grant at Collins & Aikman that it "would do anything it could to support" him because he had "put Collins & Aikman into the game." In the meantime, however, Whitener, acting through Gomez Floor Covering as the exclusive dealer under the 1996 State Contract, tried to by-pass Thomason and his company CPS Network by writing orders directly to Collins & Aikman, although without knowledge of the correct Collins & Aikman pricing; Thomason had never shown Whitener the Collins & Aikman pricing schedule he obtained for the 1996 State Contract bid. Throughout the fall of 1996, Collins & Aikman encouraged Gomez to submit its orders through Thomason's company CPS Network.

By January 1997, the relationship between the parties further deteriorated. Collins & Aikman decided to re-quote its prices directly to Gomez, effectively cutting out Thomason. When Collins & Aikman did provide a pricing schedule to Gomez, the prices were higher than on the schedule Collins & Aikman had provided to Thomason for submission on the 1996 Contract bid. At trial, Collins & Aikman claimed the increased prices were due to increased costs, but Thomason claimed that the price increases were actually his margins that were now being kept by Collins & Aikman.

On January 23, 1997, Collins & Aikman informed Thomason in writing that, while it intended to continue working with CPS on contract orders, it would only compensate him for "commissions earned" based on his "direct involvement in the [contract] orders we receive," noting that "this process worked well last year and we want you to be directly involved in securing future business towards this contract." Grant assured Thomason that it was "just verbiage," and he would still be paid on every order under the 1996 State Contract. On May 12, 1997, Collins & Aikman informed Thomason by letter that "with the change of assignment of the State of Texas Contract from Green Carpets to Gomez Floors, and your lack of involvement in bringing in new customers to our program," it would no longer authorize commissions to CPS Network. Thomason subsequently sued Collins & Aikman for various causes of action. A jury trial was held on Thomason's quantum meruit claim; the jury found that Thomason had performed compensable work for Collins & Aikman and awarded him approximately $1 million in damages, plus pre-judgment interest and attorney's fees. Collins & Aikman timely appealed.[2]

On appeal, Collins & Aikman asserts three issues: (1) the evidence is legally and factually insufficient to support the jury's finding that Collins & Aikman is liable on Thomason's quantum meruit claim; (2) the evidence is factually insufficient to support approximately one-half of

**2.** This is the third time this Court has heard an appeal arising from this dispute. In 1999, we affirmed a declaratory judgment in favor of Thomason (and CPS Network) finding that he had a 50% interest in the profits Gomez Floor Covering earned from the 1996 State Contract. *See Whitener v. Contract Prod. Serv. Network,* No. 04–98–00605–CV, 1999 WL 1020940 (Tex.App.–San Antonio Nov. 10, 1999, pet. denied) (not designated for publication). Gomez Floor Covering subsequently settled with Thomason, paying him approxi-

mately $600,000. Then, in 2004, this Court addressed the issue of Thomason's standing to sue Collins & Aikman for the unpaid margins at issue in this case. We reversed the trial court's summary judgment as to Thomason's claims for quantum meruit, constructive trust and breach of agency, holding there was a fact issue concerning standing, and affirmed the summary judgment as to his other claims. *See Thomason v. Collins & Aikman Floorcoverings, Inc.,* No. 04–02–00870–CV, 2004 WL 624926 (Tex. App.-San Antonio March 31, 2004, pet. denied).

the total damages awarded by the jury; and (3) the evidence is insufficient to support the award of attorney's fees because the fees were not segregated by claim, and the fees were calculated based on a percentage of the recovery rather than on the value of the legal work performed.[3] We will begin by addressing Collins & Aikman's issue concerning liability.

### QUANTUM MERUIT

Collins & Aikman first challenges the legal sufficiency of the evidence on the fourth element of Thomason's quantum meruit claim. Collins & Aikman argues that at the time Thomason rendered the "putative service" of having Collins & Aikman products included in the 1996 State Contract, Thomason did not subjectively believe that Collins & Aikman would pay him for those services. Therefore, Collins & Aikman asserts the judgment should be reversed based on legal insufficiency, and a take-nothing judgment should be rendered in its favor. Alternatively, Collins & Aikman claims the evidence is factually insufficient on the fourth element.

### *Standard of Review*

■■■ When a party challenges the legal sufficiency of the evidence supporting an adverse finding on an issue on which it did not have the burden of proof, it must demonstrate on appeal that there is no evidence to support the adverse finding. *Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex.1983); *Myrex Indus., Inc. v. Ortolon,* 126 S.W.3d 548, 550 (Tex.App.-Houston [14th Dist.] 2003, pet. denied). We consider all the evidence in the light most favorable to the jury's finding of the disputed fact, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors

could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 810–11 (Tex.2005). One of the grounds for sustaining a "no evidence" point is when the record shows "the evidence establishes conclusively the opposite of [a] vital fact." *City of Keller,* 168 S.W.3d at 810–11. In reviewing factual sufficiency, we consider all the evidence and will set aside the verdict only if the evidence supporting the jury finding is so weak or so against the overwhelming weight of the evidence that the finding is clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). In conducting this review, we do not substitute our judgment for that of the jury, as they are the sole judge of the credibility of the witnesses and the weight to be given their testimony. *City of Keller,* 168 S.W.3d at 819, 821. Because Collins & Aikman did not object to the jury charge submitted on the issue of liability, we review the sufficiency of the evidence in light of the charge submitted. *Bradford v. Vento,* 48 S.W.3d 749, 754 (Tex.2001).

### *Analysis*

■■■ *1. Applicable Law.* Quantum meruit is an equitable theory of recovery based on an implied agreement to pay for benefits received. *Heldenfels Bros., Inc. v. City of Corpus Christi,* 832 S.W.2d 39, 41 (Tex.1992); *Richter v. Wagner Oil Co.,* 90 S.W.3d 890, 894 (Tex.App.-San Antonio 2002, no pet.). A party may recover under quantum meruit only when there is no express contract covering the services rendered. *Vortt Exploration Co. v. Chevron U.S.A., Inc.,* 787 S.W.2d 942, 944 (Tex. 1990). The four elements of quantum meruit, as properly submitted in the jury charge in this case, are: (1) valuable services were rendered; (2) to the party

---

**3.** In a post-submission letter brief dated November 19, 2007, Collins & Aikman withdrew its issue challenging the trial court's denial of

its proposed jury instruction on the measure of damages.

sought to be charged; (3) which services were accepted by the party sought to be charged; (4) under such circumstances as reasonably notified the recipient that the plaintiff, in performing such services, expected to be paid by the recipient. *Heldenfels*, 832 S.W.2d at 41; *Richter*, 90 S.W.3d at 894; *see also Texas Pattern Jury Charges: Business, Consumer, Insurance & Employment* PJC 101.42 (2006).

On appeal, Collins & Aikman only challenges the evidence supporting the fourth element—particularly, the part of the element dealing with the plaintiff's expectation of payment from the recipient of the services. We note that the plaintiff's expectation of payment for services rendered is only one part of the fourth element of quantum meruit. *See Richter*, 90 S.W.3d at 895–96 (analyzing the evidence concerning the requirement under the fourth element of quantum meruit that Richter expected to be paid for passing on certain information); *West Teleservices, Inc. v. Carney*, 75 S.W.3d 455, 460 (Tex.App.-San Antonio 2001, no pet.) (noting that no recovery in quantum meruit can be had where the plaintiff had actual knowledge and understanding prior to performing the services that he or she would not receive compensation). The fourth element also requires proof that the recipient of the services had reasonable notice that the plaintiff, in performing such services, expected to be paid by the recipient. *See Heldenfels*, 832 S.W.2d at 41 (reviewing evidence that plaintiff reasonably notified the city that it expected to be paid by city); *see also Vortt*, 787 S.W.2d at 944–45 (discussing reasonable notice of plaintiff's expectation of payment as element of quantum meruit). Here, Collins & Aikman maintains that: (1) Thomason's own trial testimony conclusively established that Thomason did not subjectively expect to be paid by Collins & Aikman at the time of his services, but, rather, expected to be compensated through the profits of his new partnership with Gomez Floor Coverings; and (2) Thomason did not notify Collins & Aikman of his expectation of payment—"indeed, such an expectation did not exist." Accordingly, it argues Thomason's own testimony negates the findings necessary to support the judgment.

■ *2. Legal Sufficiency Challenge.* The gist of Collins & Aikman's "no evidence" argument is that Thomason's testimony that he believed he had a "deal" or a "partnership" with Whitener and/or Gomez Floor Coverings on May 1, 2006, the night before submission of Gomez's bid for the 1996 State Contract, and expected to be compensated in the future by sharing in Gomez's profits, "conclusively establishes" that he did not expect to receive any commissions from Collins & Aikman from that date forward. Specifically, Thomason testified that, "[I] carried all of my margins into whatever deal that Steve [Whitener] and I were going to structure to run this contract," and "if we won the contract, I was going to be compensated by the partnership that we created," and "if the partnership had gone forward, I would have gotten all my compensation from Gomez, not Collins & Aikman." Thomason testified that his intent was to "put everything into this partnership," but that Whitener "never accepted" Thomason's margins, and they wound up "in Collins & Aikman's pocket." Thomason agreed that under the deal with Whitener he was going to get paid by Gomez in the future, and "there was no situation [in the future] . . . that I would have been paid commissions . . . if we would have consummated the partnership, it would have all been in the partnership."

We disagree with Collins & Aikman's position that the above quoted testimony

by Thomason conclusively negates Thomason's expectation that he would receive margins from Collins & Aikman for sales under the 1996 State Contract. To the contrary, his testimony that, "[I] carried all of my margins into whatever deal that Steve [Whitener] and I were going to structure to run this contract" shows, or at least gives rise to a reasonable inference, that Thomason did anticipate receiving margins from Collins & Aikman at the time he did the work to ensure Collins & Aikman products were included on the 1996 State Contract. In fact, Thomason's testimony shows, or creates a reasonable inference, that Thomason considered those expected margins a valuable contribution that he in turn "carried" into the proposed partnership. The fact that Thomason also believed that, once he contributed his margins to the proposed partnership, his future compensation would come from the overall partnership profits and not directly from Collins & Aikman does not negate, as a matter of law, his expectation that he would receive, in some form, the margins that Collins & Aikman owed him. Therefore, we disagree with Collins & Aikman that the sole reasonable inference that could be drawn from Thomason's testimony is that he had no expectation of receiving margins from Collins & Aikman under the 1996 State Contract.

Furthermore, we disagree that the evidence conclusively establishes that Thomason did not give reasonable notice to Collins & Aikman that he was expecting payment for his services until **after** the contract was awarded to Gomez and he was denied his claimed partnership interest in Gomez. At trial, Thomason testified about his conversations with Grant at Collins & Aikman during the spring of 1996, well before the 1996 State Contract was awarded. Based on their discussions, Grant supplied Thomason with the new pricing and product information and en-

couraged Thomason to position Collins & Aikman products on the 1996 State Contract. This testimony shows, or at least creates a reasonable inference, that Collins & Aikman was aware of Thomason's desire for and expectation of compensation if he was successful in securing placement of Collins & Aikman products into the 1996 State Contract. We further note that during oral argument, Collins & Aikman conceded that at the time of the 1996 State Contract bid it was not aware of the proposed partnership between Thomason and Whitener, and thus had no knowledge that Thomason planned to contribute his margins in order to share in Gomez's profits. Because we conclude there is evidence to support the jury's finding that Collins & Aikman had reasonable notice that Thomason, in performing services on their behalf, expected Collins & Aikman to pay his margins on sales under the 1996 State Contract, we overrule its legal sufficiency challenge.

*3. Factual Sufficiency Challenge.* Collins & Aikman next argues, in the alternative, that the evidence is factually insufficient to support the judgment. Specifically, Collins & Aikman maintains Thomason's testimony that his intent, at the time he rendered his services, was to be paid by Gomez makes a finding in his favor on that issue clearly wrong. We disagree. The evidence supporting the jury's finding that Thomason, in performing services on their behalf, expected Collins & Aikman to pay his margins is not so weak or so against the overwhelming weight of the evidence as to be clearly wrong and unjust.

Jeff Raabe, Vice President of Sales for Collins & Aikman, testified that Thomason was their "quarterback" for the State contracts; Collins & Aikman did not know how the State contracts worked before Thomason came along; Collins & Aikman

relied solely on Thomason in getting Collins & Aikman products placed on the 1994 and 1996 State Contracts and in making sales under the contracts; and Thomason's commission deal was unique within Collins & Aikman. Specifically, under their course of dealing under the 1994 State Contract, Thomason (through CPS Network) processed all Collins & Aikman product orders and received his margin or commission on each order from the State. Raabe stated that Collins & Aikman earned $15.4 million from the State contracts, and agreed that Thomason brought Collins & Aikman "a lot of value" and was compensated for it. Further, Raabe testified that Collins & Aikman expected to pay Thomason when it supplied him with Collins & Aikman pricing in April 1996 for the 1996 State Contract bid, and the way Collins & Aikman paid Thomason was through commissions.

Thomason testified that he did no work for Gomez Floor Coverings before or after the 1996 State Contract bid—his only services on behalf of Gomez consisted of supplying the Collins & Aikman and Mannington pricing for Gomez's bid on May 1, 1996. While Thomason stated that he had intended to contribute all his margins from Collins & Aikman, as well as other manufacturers, to the anticipated partnership with Whitener, and believed that he had done so in agreeing to the "deal" on the night before the bid, the evidence showed that the "partnership" that Thomason believed he had agreed to form with Whitener never occurred; there was no written agreement between them, no business was done under any "partnership," and by his words and actions Whitener repudiated any agreement with Thomason as soon as Gomez Floor Coverings won the bid award in September 1996. Thomason further testified that Collins & Aikman would have continued to benefit from his efforts in positioning them on the 1994 State Con-

tract no matter which dealer, Gomez or another dealer, was awarded the 1996 State Contract. In fact, Thomason stated that, due to "institutional inertia," Collins & Aikman would benefit from being well-positioned on the State Contracts long after he was gone, and characterized the benefit as an "annuity."

In addition, Thomason testified that even after the 1996 State Contract was awarded to Gomez in September 1996, and Whitener repudiated their deal, Thomason continued to provide other services to Collins & Aikman in connection with the new 1996 State Contract such as: (1) consulting with Collins & Aikman about issues related to the 1996 State Contract, including positioning additional Collins & Aikman products on to the contract; (2) assisting Collins & Aikman with marketing strategies, including revising the direct mailer to list a 1–800 phone number for orders instead of CPS's phone number; and (3) continuing to sell Collins & Aikman products under the 1996 State Contract (although the orders had to go through Gomez); and (4) working to secure future projects for Collins & Aikman. Raabe agreed that Thomason continued working on projects for Collins & Aikman after the 1996 bid award in September 1996; he insisted Thomason got paid commissions for that work. Several exhibits consisting of correspondence between Thomason and Grant at Collins & Aikman, as well as between Thomason and Bode at GSC, show a continuing business relationship between Thomason and Collins & Aikman during late 1996 and early 1997.

Thomason testified he "wanted to put the old deal back in place" with Collins & Aikman after his agreement with Whitener failed, and that he "wanted to be paid." Raabe stated they could not go back to the old deal because Whitener did not want to work with Thomason, but Collins & Aik-

man, through David Grant, was trying to work out "the same type of deal" with Thomason; Grant's letter to Thomason asking him to review "adjustments . . . based on Collins & Aikman and CPS sharing in the profits" under the 1996 Contract was in effect offering Thomason a similar deal. Raabe testified Collins & Aikman was "panicked" at the thought of losing Thomason's assistance with the State contract business, and was trying to work out a way for all three parties, Collins & Aikman, Thomason and Gomez, to be compensated.

In addition to Thomason's testimony about his subjective expectation of payment from Collins & Aikman during these post-September 1996 services, a series of letters were introduced at trial; these letters show Thomason's expectation of payment as well as Collins & Aikman's reasonable notice that Thomason expected them to pay for his services. On October 15, 1996, Thomason sent a letter to Grant at Collins & Aikman in which Thomason noted the continuing "unresolved issues" between Gomez and CPS, and stated, "[w]hile I would not interfere with Collins & Aikman's ability to pursue any business opportunity, I would appreciate your continuing to honor our relationship in a manner consistent with that established over the past couple of years." Thomason testified the point of the letter was to ask Collins & Aikman to continue to work through him as its representative for the State contract and to continue to compensate him "like we had done prior to the award of the second contract." Grant's response on behalf of Collins & Aikman was to assure Thomason that Collins & Aikman knew he had "brought them to the party," and had "put Collins & Aikman into the game," and that Grant "would do anything he could to support me."

Thomason testified that he had on-going discussions with Grant from October 1996 through January 1997 about the business arrangement between Collins & Aikman and Thomason, and kept trying to get "something in writing" from Collins & Aikman about their agreement. He stated he thought Grant's pricing letters exchanged with him in January/February 1997 showed Grant was "putting together new pricing so 'everybody' could get compensated—Collins & Aikman, Thomason and Gomez," and that they were developing a "compensation profile" for Thomason "very similar to the old deal." Also, Thomason continued to "write business" for Collins & Aikman and provide other services to Collins & Aikman during that time period. For example, on November 7, 1996, Steve Morgan at Collins & Aikman faxed Thomason asking for his help in revising the mailer for the 1996 State Contract; Thomason complied and assisted Collins & Aikman, which included switching the phone number for all orders to a 1–800 number. Thomason stated that during this period, "everything appeared to be working fine," and he was told by Grant on several occasions to "trust me . . . we're not in the habit of taking money from people." Although he never received a written agreement, Thomason believed he could trust Grant and Collins & Aikman because they had always paid him in the past.

After reviewing all the evidence relevant to the jury's finding of the disputed fourth element of quantum meruit, we conclude the evidence is legally and factually sufficient to support the finding that Thomason expected to be paid by Collins & Aikman at the time he rendered his services to them.

### DAMAGES

 In its second issue, Collins & Aikman asserts that Thomason's testimo-

ny that he performed no services on behalf of Collins & Aikman under "State Contract No. 3," which began on December 1, 1999,[4] renders the evidence factually insufficient to support approximately one-half of the damages awarded by the jury. Specifically, Collins & Aikman argues the evidence is insufficient to support the award of $526,773.03 of the total damages of $1,053,417.98; it concedes the evidence is sufficient to support the $526,644.95 award. Therefore, Collins & Aikman asserts a remand for a new trial, or a suggestion of remittitur of $526,773.03, is required. See TEX.R.APP. P. 44.1(b) (appellate court may not order a separate trial solely on unliquidated damages if liability is contested); 46.3 (appellate court may suggest a remittitur). Thomason responds that the total damages award falls within the range of evidence and that he presented the best evidence available of the reasonable value of his services. Thomason further asserts that his efforts on behalf of Collins & Aikman carried over into State Contract No. 3; specifically, he points to evidence that the same or similar Collins & Aik-

man products he originally placed on the 1994 and 1996 State Contracts remained on future contracts and extensions, and continued to be sold to the State through 2002. We review the damages evidence under the factual sufficiency standard discussed supra. See Cain, 709 S.W.2d at 176.

### Analysis

The evidence concerning Thomason's claimed damages, represented by the margins he claims belonged to him but were retained by Collins & Aikman through its price increases to Gomez, consisted of witness testimony and the total invoices for Collins & Aikman products sold from September 1996 through 2002. At trial, the total Collins & Aikman invoices for products sold under the 1996 State Contract and State Contract No. 3 were admitted into evidence and analyzed by Thomason. He testified that, applying his average 11.7% commission rate to the total sales under the two contracts yielded the following margins calculated in two different ways:

(1) <u>1996 State Contract</u>: (September 12, 1996—November 31, 1999)

Total Collins & Aikman Sales = $8,075,088
 x 11.7% margin = $944,785
OR
 x 11.7% margin only on Collins & Aikman "original products" = $526,644.95

(2) <u>State Contract No. 3</u>: (November 31, 1999—January 16, 2002)

Total Collins & Aikman Sales = $6,889,694
 x 11.7% margin = $806,094
OR
 x 11.7% margin only on Collins & Aikman "original products" = $526,773.03 [5]

The 11.7% margin calculated only on the sales of "original products" is limited to

the products that were listed on the original Collins & Aikman pricing schedule that

---

4. The parties stipulated that a third State Contract was entered into after expiration of the 1996 State Contract on November 31, 1999; the parties referred to it as "State Contract No. 3."

5. These calculations were also admitted into evidence as a plaintiff's exhibit.

Thomason received for purposes of the 1996 State Contract bid. The other higher margin calculations represent both "original products" plus other invoiced sales for Collins & Aikman products for which Thomason had no pricing; he stated that he estimated the prices for those products based on his prior experience and knowledge of the industry. The jury awarded Thomason $1,053,417.98 in total damages, which is the sum, to the penny, of the $526,644.95 and $526,773.03 margin calculations on Collins & Aikman "original products" which Thomason testified were sold under the 1996 State Contract and State Contract No. 3.

■ As noted, Collins & Aikman only challenges the sufficiency of the evidence to support the award of $526,773.03 of the damages. In support, Collins & Aikman cites Thomason's testimony that he provided no services under State Contract No. 3; he did not participate in the preparation of any bid for a State contract subsequent to the 1996 State Contract; he had no contact with Collins & Aikman regarding pricing for a third State contract; and he did not personally sell any carpet under any State contract after the 1996 State Contract. Arguing that the total damages award is supported by sufficient evidence, Thomason cites us to his testimony that each of the State contracts was "self-fulfilling," and that his efforts in placing Collins & Aikman products on the 1994 and 1996 State Contracts created long-term benefits to Collins & Aikman that lasted beyond the end of the particular contract period. In addition, there was evidence that each contract had an "overlap period" at the end of the specific contract term in which products were still being invoiced and delivered under the prior contract, and also

contained provisions for extensions of the term.

As noted above, Thomason testified that he continued to sell Collins & Aikman products under the 1996 State Contract, and to provide other related services to Collins & Aikman, from September 1996 through May 1997, at which time Collins & Aikman sent him a letter "officially calling it quits." Thomason conceded that from April 1997 through December 1999 he did not sell any Collins & Aikman products under the 1996 State Contract.[6] Finally, as noted by Collins & Aikman, Thomason agreed that he did not participate in any third State Contract.

In light of Thomason's testimony conceding that Collins & Aikman notified him in writing that it was "officially calling it quits" in May 1997, and his testimony that he did not participate in any bid for or sales under State Contract No. 3, he has negated any right of recovery under his quantum meruit claim during the term of State Contract No. 3. See *Truly v. Austin,* 744 S.W.2d 934, 937 (Tex.1988) (denying recovery where claimant had not performed services for defendants). While we acknowledge that, generally, we may not speculate on the jury's reasoning or calculations in awarding damages, here we are not speculating as to the jury's damages deliberations because Thomason's damages model and testimony explaining the unpaid margins he was seeking to recover is the only damages evidence in the record. Thomason's damages model broke down his claim for unpaid margins under the two State contracts, and the jury's damages award of $1,053,417.98 constitutes the *exact* sum of the two margin calculations for "original products"—to the penny. Because the only evidence in the record to support an award of $526,773.03 is the

---

6. The original term of the 1996 State Contract ran from September 12, 1996 through November 31, 1999; Thomason did not know whether it was in fact extended.

margin calculation for sales during the term of State Contract No. 3, and Thomason conceded he performed no services related to State Contract No. 3, we suggest a remittitur in that amount. *See* Tex. R.App. P. 46.3; *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41, 51 (Tex.1998) (court of appeals may suggest a remittitur in lieu of ordering a new trial); *Comstock Silversmiths, Inc. v. Carey*, 894 S.W.2d 56, 58 (Tex.App.-San Antonio 1995, no writ).

## ATTORNEY'S FEES AWARD

Finally, Collins & Aikman argues the trial court's award of $351,135.82 in attorney's fees (plus $70,231.37 in conditional appellate fees) was an abuse of discretion because: (1) the evidence is factually insufficient because Thomason failed to segregate his attorney's fees by claim; and (2) using a percentage of the damages to calculate Thomason's attorney's fees was improper because a "lodestar" calculation (hours worked multiplied by the hourly rate) was provided. Turning to the record, it is clear the trial court based its calculation of attorney's fees solely on the contingent fee agreement between Thomason and his counsel and awarded a percentage of the total recovery. In fact, the judgment itself recites that attorney's fees are awarded "equal[ing] 33 1/3% of the amount of the jury verdict."

Because we are suggesting a remittitur of $526,773.03 of the damages awarded, we must also remand for recalculation of the attorney's fees; therefore, we need not address the merits of Collins & Aikman's third issue. *See Young v. Qualls*, 223 S.W.3d 312, 314–15 (Tex.2007) (per curiam). We do note, however, that Texas law only allows recovery of attorney's fees if authorized by statute or contract, and that fee claimants are required to segregate fees between claims for which fees are recoverable and not recoverable.

*See Tony Gullo Motors I, L.P. v. Chapa,* 212 S.W.3d 299, 311, 313–14 (Tex.2006) (reaffirming general rule requiring segregation of attorney's fees).

## CONCLUSION

Based on the foregoing reasons, we hold the evidence is legally and factually sufficient to support the jury's finding on liability. However, because we hold the evidence is insufficient to support the award of $526,773.03 of the total damages, we suggest a remittitur of that amount under Texas Rule of Appellate Procedure 46.3. If a remittitur is timely filed within twenty (20) days from the date of this opinion and judgment, the trial court's judgment as to liability is affirmed, its judgment as to damages is reformed and affirmed in the amount of $526,644.95, and its judgment as to attorney's fees and pre-judgment interest is reversed and remanded for recalculation. If a remittitur is not timely filed, the trial court's judgment is reversed and the cause is remanded for a new trial.

## SUPPLEMENTAL OPINION

### PER CURIAM.

In compliance with the suggestion of remittitur contained in this court's opinion and judgment issued February 27, 2008, James Bradley Thomason d/b/a Contract Products Services Network, appellee, timely filed a consent to remittitur of $526,773.03 on March 14, 2008. Accordingly, the trial court's judgment as to liability is affirmed, and its judgment as to damages is reformed by a reduction of $526,773.03 and is affirmed in the amount of $526,644.95. *See* Tex.R.App. P. 46.3. The trial court's judgment as to attorney's fees and pre-judgment interest is reversed and remanded for recalculation.