Opinion issued June 23, 2022



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-20-00412-CV

_____

**JOHN SCHERER, Appellant**

**V.**

**TEXAS COAST YACHTS, LLC AND FOUNTAINE PAJOT, S.A., Appellees**

---

On Appeal from County Court at Law No. 2
Galveston County, Texas
Trial Court Case No. CV-0078309

---

## MEMORANDUM OPINION

Appellant John Scherer purchased a 44-foot yacht from appellee Texas Coast Yachts, LLC, a yacht dealership. The yacht was manufactured in France by appellee Fountaine Pajot, S.A., a French company. Two years after purchasing the vessel, Scherer sued Texas Coast Yachts and Fountaine Pajot. Among his complaints,

Scherer alleged that the yacht had numerous defects, which the two defendants had failed and refused to fix as required under the yacht's warranty. Scherer asserted a wide array of causes of action under Texas law, ranging from breach of contract and breach of express and implied warranties to various torts, including fraud, negligence, and negligent misrepresentation. Scherer also pleaded French law claims for breach of legal guarantees, which the trial court ruled he could not pursue.

The jury found in favor of Texas Coast Yachts and Fountaine Pajot. The trial court rendered a take-nothing judgment against Scherer on the jury's verdict. On appeal, Scherer raises four issues. He contends that the trial court erred by (1) incorrectly defining a term in the jury charge (issue one); (2) ruling that Scherer could not pursue claims under French law (issue two); and (3) failing to rule, as a matter of law, that a disclaimer of reliance in the purchase agreement for the yacht was not binding on Scherer (issues three and four).

We affirm.

## Background

In 2012, John Scherer began thinking about retiring from the oilfield company that he helped establish in 1982. Over the years, Scherer, who lived in Midland, Texas, had developed an interest in boating. When he retired, Scherer planned to move to the Houston area to be closer to the ocean. He wanted to purchase a sailing catamaran so he could sail from Texas to the Caribbean, the Bahamas, and

Chesapeake Bay. After researching sailing catamarans and attending boat shows, Scherer narrowed his choices down to three models. Two of these models, the 41-foot Lipari and the 44-foot Helia, were made in France by Fountaine Pajot (FP).

In October 2014, Scherer attended a boat show in Annapolis, Maryland where he met Michael Clark, a salesman for Texas Coast Yachts (TCY). Clark was working at an FP display and informed Scherer that TCY was FP's authorized dealer for the Gulf Coast region. FP's Helia and Lipari catamarans were on display at the show. Clark discussed the FP catamarans with Scherer, providing him with brochures and introducing him to FP representatives. After the boat show, Clark continued to correspond with Scherer by email regarding pricing of the catamarans.

In February 2015, Scherer attended the Miami boat show. Clark did not attend, but Jeff Johnson, TCY's owner, was there working at the FP display. Johnson told Scherer that if he purchased the Helia at the boat show, he would receive a discounted price. Scherer asked about warranties on the Helia, and Johnson confirmed that FP provided a warranty on the vessel. He also told Scherer that TCY, which is based in Kemah, Texas, was the service provider for the warranty.

On February 13, 2015—while at the boat show—Scherer decided to purchase the Helia model. Johnson went through a list of optional equipment items with Scherer that could be installed on the yacht. Scherer signed a one-page contract (the Purchase Agreement) agreeing to purchase a 44-foot FP Helia sailing catamaran (the

3

Catamaran). Based on the equipment items selected by Scherer, Johnson calculated the Catamaran's retail price to be $679,827.16 and its total price, including tax, to be $723,610.77. Those prices were reflected in the Purchase Agreement. In a section of the Purchase Agreement indicating how the Catamaran would be equipped, the parties agreed that the vessel would be equipped "as per" a spreadsheet "to be signed." At trial, Johnson and Scherer testified that adjustments to the Catamaran's final price were made based on Scherer's final selection of equipment options.

Scherer understood that the boat would be constructed by FP in France and then sailed across the Atlantic Ocean to Galveston, Texas by a delivery crew hired by TCY. Scherer testified that he knew that he was required to pay the cost of the Catamaran's ocean delivery, as well as fees and duties, totaling $40,700.

Under the Purchase Agreement's "Terms and Conditions," Scherer agreed that he was "not relying on any representations by [TCY] in purchasing the yacht" and that he "had ample opportunity to investigate the purchase of the yacht and [had] arrived at [his] own conclusion whether [he] should buy it." TCY also disclaimed that it had made any express or implied guarantees or warranties to Scherer "concerning the yacht including, but not limited to, any warranties [for] fitness for a particular purpose, merchantability, or title." (Emphasis omitted.)

The Purchase Agreement required Scherer to pay a non-refundable deposit of $10,000 by February 20, 2015. It further required Scherer to pay an additional 20

percent of the total price by March 10, 2015, and to pay the balance prior to the Catamaran's completion. Scherer made all the payments to TCY.

FP's warranty on the Helia was for two years except the vessel's structure was warrantied for five years. Three days after he signed the Purchase Agreement, Scherer received FP's written warranty.

TCY retained a company, Uchimata, to take possession of the Catamaran in France on TCY's behalf once the vessel's construction was completed. Uchimata also installed the "electronics package" on the Catamaran, post-factory. FP manufactured an electronics package, but Scherer had chosen a package manufactured by a different company, Raymarine, thus the warranty for the electronics package was through Raymarine not FP.

At the end of June 2015, FP completed construction of the Catamaran and handed it over to Uchimata in La Rochelle, France. In addition to installing the electronics package, Uchimata was tasked with inspecting the Catamaran to determine if anything needed to be addressed regarding its operation. Under the terms of the dealer licensing agreement between TCY and FP, TCY had eight days after taking possession to report any problems with the Catamaran to FP. If reported within the eight-day period, FP was directly responsible for fixing the problem. After that, TCY would be responsible for remedying any problems under FP's warranty as the warranty service provider. If TCY repaired a problem covered by FP's

warranty, then FP would reimburse TCY for the repair cost. Uchimata reported no problems with the Catamaran to FP after taking possession.

Three weeks after Uchimata took possession of the Catamaran, Scherer and Clark traveled to La Rochelle, France. They spent time on the Catamaran and took it out for a test sail. They noticed several problems with the Catamaran, including problems with its electronics and mainsail. Clark reported the issues to Uchimata, Johnson, and FP. Uchimata stated that it would fix the problems before the boat left France.

While en route from France to Texas, the delivery crew hired by TCY experienced problems. When they first left France, the crew had to turn around because the Catamaran's auto pilot was not working. Once the repair was made, the vessel began its voyage to Texas on August 7, 2015. En route, the delivery crew reported that it had picked up "bad fuel" in the Azores and needed to stop in Saint Martin for nine days to address the problem. It was also hurricane season, which caused delays because the vessel had to sail around storms.

Scherer expressed his frustration to TCY about how long the delivery was taking. The Catamaran arrived in Galveston on October 5, 2015. It then sailed to TCY's docks in Kemah. TCY's service manager, Douglas Markee, began "commissioning" the Catamaran, meaning preparing it for use. As part of that

process, records show that certain repairs were made to boat, including to its bilge pump and air conditioning.

Scherer had planned to race the Catamaran in the Harvest Moon Regatta, scheduled for late October 2015. The racecourse for the regatta ran from Galveston to Port Aransas. The 2015 regatta was cancelled due to weather concerns, but Scherer and some friends, including Clark, still decided to sail the course. On the return trip, the Catamaran hit a semi-submerged log. At trial, Scherer testified that the impact made the boat stop moving and knocked him off his feet.

In November 2015, the Catamaran was hauled out of the water for routine maintenance. During the haul out, a crack in the leading edge of the starboard keel was discovered. Markee suggested to Scherer that they keep the Catamaran out of the water to fix the keel, but Scherer chose to put it back in the water, stating that he planned to use it during the holidays.

Markee worked on the Catamaran from November 2015 to January 2016 to resolve problems that were identified with the vessel, such as leaks and the malfunctioning electronics. He corresponded with FP regarding issues, and FP was responsive, identifying issues that were covered by its warranty. But FP informed Markee that the issues with the electronics were not covered by its warranty because the electronics were manufactured by Raymarine. Markee worked with Raymarine and a Raymarine service provider to address the electronics issues.

On February 19, 2016, Scherer's attorney emailed Clark and Johnson, requesting that TCY return the keys they had to the Catamaran. The email also stated that Scherer had "many unresolved issues with the boat" but did not identify the specific issues. The attorney indicated that Scherer had not been able to use the boat because of the problems. The attorney requested that TCY direct any further communications about the Catamaran to her.

In March 2016, Scherer hired a marine surveyor to inspect the Catamaran to identify problems needing repair. Based on the surveyor's report, Scherer's attorney sent a demand letter to TCY in June 2016 identifying 65 "deficiencies and defects" with the Catamaran. Among the problems, the letter identified the split starboard keel and issues with the boat's steering, electronics, navigation system, main cabin door, rigging, and sails. The letter claimed that, despite Scherer's notifying TCY of problems with the Catamaran, TCY "had been unable or unwilling to confirm or undertake adequate steps to address the vessel's noted defects and deficiencies." The letter stated, "[P]lease consider this formal written notice of all referenced and previously noted defects and deficiencies and invocation of all warranties, implied and express."

After receiving the demand letter, TCY inspected the Catamaran to determine which issues were warranty items. In December 2016, FP's customer service

representative, Alexander Derche, traveled from France to Texas for a three-day visit to investigate and address Scherer's complaints.

At trial, Derche testified that, on the first day of his visit, he boarded the Catamaran and determined that the steering problem was caused by a broken screw. While onboard, he replaced the screw, fixing the problem. On the second day of his visit, Derche inspected the Catamaran with Scherer's marine surveyor to identify additional issues. Derche testified that they inspected the rigging but found it in good condition. He stated that he and the marine surveyor also fixed a problem with the air conditioning. Derche testified that he had agreed to fix a problem with the main cabin door, which Markee later repaired. Derche also agreed to fix a hole in the mainsail even though it was not a warranty repair. On the last day of his visit, Derche was present when a crane removed the mainsail from the boat for repair.

Derche testified that before he left Texas, FP agreed to fix certain problems on the Catamaran. When he returned to France, Derche sent parts to Texas for the agreed-upon repairs. Markee continued to work on the Catamaran to fix the issues that FP had agreed to resolve. However, TCY and FP had not agreed to resolve all of the 65 listed "deficiencies and defects." For instance, neither TCY nor FP agreed to fix the split starboard keel. Derche testified that it appeared that the split was caused by the vessel colliding with an object. FP and TCY were aware that the

9

Catamaran had hit a submerged log while sailing the course for the Harvest Moon Regatta. Derche testified that FP's warranty did not cover collision damage.

On February 17, 2017, Scherer filed suit against FP and TCY. He asserted that, when he received it, the Catamaran had numerous defects. For instance, he claimed that the keel had spilt because it had been defectively manufactured. Scherer alleged that he had requested that the unresolved defects be repaired, but TCY and FP failed and refused to make the repairs as required under the applicable warranties. In his third amended petition—his live pleading—Scherer asserted claims under Texas law for breach of contract and for breach of express and implied warranties. He also asserted a claim under the federal Magnuson–Moss Warranty Act. *See* 15 U.S.C. §§ 2301–2312.

In conjunction with the contract and warranty claims under Texas law, Scherer also asserted claims under French law for breach of legal guarantees. In his pleadings, and in a separately filed request, Scherer asked the trial court to take judicial notice of the applicable French law pursuant to Rule of Evidence 203. He also offered English translations of the French legal code under which he asserted his claims, and he offered the affidavit and deposition testimony of a French attorney, who summarized the provisions and explained their applicability to this case. Both sides also provided briefing to the trial court regarding whether Scherer should be permitted to assert French-law claims. After hearing the parties'

10

arguments, the trial court ruled that Scherer could not pursue claims under French law. During the charge conference, Scherer offered liability and damages questions for his French-law claims for inclusion in the jury charge. The trial court refused the questions.

In his pleadings, Scherer also alleged that TCY and FP had misrepresented the quality and capabilities of the Catamaran, the quality and extent of their warranties, and the nature and extent of the services they would provide to him. Related to these allegations, Scherer asserted claims for fraud and negligent misrepresentation. In addition, Scherer asserted a claim for trespass, alleging that the defendants' representatives had boarded the Catamaran without his permission to show it to prospective FP customers and to make repairs. And he sued for conversion and theft, alleging that TCY had "removed, kept, and refused to return safety and other equipment from the vessel."

The case was tried to a jury in January 2020. The trial lasted three weeks. The witnesses included Derche, Clark, Johnson, Markee, Scherer, and the parties' experts. In addition, over 500 exhibits were admitted into evidence, including the Purchase Agreement, FP's warranty, correspondence between the parties, photographs, videos, and invoices.

TCY and FP defended against the suit by showing that they had repaired or made efforts to repair the defects of which they were aware and that were covered

by warranty. They pointed out that FP's express warranty required Scherer to provide written notice for any defect. The evidence showed that Scherer had not given written notice of any specific defects before his attorney sent the June 2016 demand letter listing 65 alleged "defects and deficiencies." TCY and FP asserted that, after receiving the letter, they had worked to resolve any warranty repairs.

At trial, Scherer sought actual damages, exemplary damages, and attorney's fees. As actual damages, he requested the amount of money he had spent to repair the Catamaran in order to sell it. After filing this suit, he made repairs to the Catamaran and sold it in 2018. He offered evidence showing that he had spent $93,750 on repairs. TCY and FP disputed the amount, pointing out that some of the repairs were ordinary maintenance not covered by warranty.

The evidence showed that, in 2016, Scherer purchased another sailing yacht while he still owned the Catamaran. Scherer sought damages, totaling $558,000, for his loss of use of the Catamaran until the time he purchased the new yacht. Scherer calculated the loss-of-use-damages by multiplying $9,000—the cost per week to charter a similar yacht—by 62 weeks, the amount of time that passed until he purchased his second yacht. TCY and FP countered by pointing to evidence showing that Scherer used the Catamaran during the 62-week period. Finally, Scherer offered evidence to support his attorney's fees, which exceeded $1 million.

The jury rendered its verdict in favor of FP and TCY. Based on the jury's verdict, the trial court signed a take-nothing judgment against Scherer. After the trial court denied Scherer's motion for new trial, this appeal followed. Scherer challenges the trial court's judgment in four issues.

## Charge Error

In his first issue, Scherer contends that the trial court incorrectly defined the term "Purchase Agreement" in the jury charge.

### A.    Standard of Review

"The [trial] court shall submit such instructions and definitions as shall be proper to enable the jury to render a verdict." TEX. R. CIV. P. 277. "The goal is to submit to the jury the issues for decision logically, simply, clearly, fairly, correctly, and completely." *Hatfield v. Solomon*, 316 S.W.3d 50, 57 (Tex. App.—Houston [14th Dist.] 2010, no pet.). To meet this goal, the trial court is given broad discretion in submitting questions, instructions, and definitions, so long as they are legally correct. *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 664 (Tex. 1999).

Scherer does not assert that the definition of "Purchase Agreement" was a misstatement of the law; that is, he does not assert that it was legally incorrect. Instead, he contends that the definition was incorrect in light of the evidence at trial. Thus, we review Scherer's challenge for an abuse of discretion. *See Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012). A trial court abuses its discretion when it acts in

13

an arbitrary or unreasonable manner, or if it acts without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

**B.      Analysis**

Question 1 of the jury charge was the following liability question for Scherer's breach of contract claim: "Did TCY fail to comply with the Purchase Agreement?" The charge defined "Purchase Agreement" as "the purchase agreement for the Catamaran dated February 13, 2015." At the informal charge conference, Scherer objected to the definition. The next day, at the formal charge conference, he offered a proposed, alternative definition, which the trial court marked "refused." Scherer's proposed definition read: "'Purchase Agreement' means the purchase agreement for the Catamaran dated February 13, 2015, *along with any adjustments and add-ons to the Purchase [A]greement.*"[1] (Emphasis added to highlight difference in definitions).

On appeal, Scherer asserts that the definition of "Purchase Agreement" submitted to the jury prevented the jury from considering anything other than the

---

[1]      At the informal charge conference, Scherer discussed referring to the one-page document that he signed as the "Sales Agreement" and referring to the one-page plus the add-ons as the "Purchase Agreement." The trial court stated it thought referring to two agreements would confuse the jury. Scherer abandoned the "Sales Agreement" language and offered the proposed definition for "Purchase Agreement" marked "refused" by the trial court.

single-page document signed by the parties on February 13, 2015 for the purchase of the Catamaran. Scherer points out that the agreement signed by the parties referenced a separate spreadsheet "to be signed later." The purpose of the spreadsheet was to list Scherer's final selection of equipment to be installed on the Catamaran from FP's options list. The Catamaran's final price would be adjusted based on Scherer's final equipment selection.

In his brief, Scherer states that "[i]t is uncontested that this separate spreadsheet was sent to Mr. Scherer" after the Purchase Agreement was signed. The spreadsheet listed the equipment options selected by Scherer to be installed on the Catamaran as well as the cost of the Catamaran's ocean delivery. Scherer contends that, "under the trial court's instructions," the jury "could not consider the specified add-on options including equipment and services TCY was obligated to perform that were not contained in the one-page [agreement]" or consider evidence of contractual performance related to the "add-on options."[2]

---

[2]    In its brief, TCY asserts that Scherer failed to preserve his complaint regarding the definition of "Purchase Agreement" in the trial court. We disagree. The Supreme Court of Texas has "explained that '[t]here should be but one test for determining if a party has preserved error in the jury charge, and that is whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling.'" *Wackenhut Corp. v. Gutierrez*, 453 S.W.3d 917, 919–20 (Tex. 2015) (quoting *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992)). At the informal charge conference, Scherer voiced his disapproval of the definition found in the charge. He asserted that the jury should be informed that there were "modifications" after the Purchase Agreement was signed. He suggested that the definition should inform the jury that there were later add-ons to the February 13 agreement. The trial court stated that it was concerned the jury would be confused

Scherer appears to read the charge's submitted definition of "Purchase Agreement" to implicitly instruct the jury to consider only the single-page document signed by the parties on February 13, 2015. We disagree with this reading. The single-page document reflected that the Catamaran would be equipped "as per [the] spreadsheet (to be signed . . .)." Because it was expressly referenced, the spreadsheet became part of the Purchase Agreement. *See In re 24R, Inc.*, 324 S.W.3d 564, 567 (Tex. 2010) (orig. proceeding) ("Documents incorporated into a contract by reference become part of that contract."). By defining the "Purchase Agreement" to mean "the purchase agreement for the Catamaran dated February 13, 2015," the jury was not only permitted to consider the post-execution documentation, but should have considered the documentation relating to the "add-ons" and "adjustments" when determining whether TCY breached the Purchase Agreement. And, despite Scherer's characterization in his briefing, the charge contains no express instruction limiting the jury's consideration of evidence relating to post-execution documents or whether TCY complied with the Purchase Agreement. Thus, we hold that it was

about whether there was more than one agreement if language was added to the definition, implicitly overruling Scherer's objection. *See* TEX. R. APP. P. 33.1(a)(2)(A) (indicating that trial court's ruling on objection may be implicit). The next day at the formal charge conference, Scherer offered his proposed definition in writing, which the trial court refused. Given the record, we conclude that Scherer made the trial court aware of his complaint, timely and plainly, and obtained a ruling on it sufficient to preserve error on appeal. *See Wackenhut Corp.*, 453 S.W.3d at 919–20.

16

within the trial court's discretion to define "Purchase Agreement" as it did in the charge.

We overrule Scherer's first issue.

## French-Law Claims

In his second issue, Scherer contends that the trial court erred "in refusing to allow [him] to pursue his claims under French law."

## A. Applicable Legal Principles

Texas courts may apply foreign law. *Long Distance Int'l, Inc. v. Telefonos de Mexico, S.A.*, 49 S.W.3d 347, 351 (Tex. 2001). The issue of whether Texas or foreign law applies to a particular controversy is a question of law that we review de novo. *Petroleum Workers Union of the Republic of Mex. v. Gomez*, 503 S.W.3d 9, 32 (Tex. App.—Houston [14th Dist.] 2016, no pet.).

However, even if we were to assume error, the erroneous ruling of the trial court would require reversal only if a review of the record under the harmless error rule revealed that the error was harmful. *See Sw. Energy Prod. Co. v. Berry–Helfand*, 491 S.W.3d 699, 728 (Tex. 2016); *Harris v. Houston Methodist Hosp.*, No. 01-17-00544-CV, 2018 WL 3233329, at *4 (Tex. App.—Houston [1st Dist.] July 3, 2018, pet. denied) (mem. op.). The harmless error rule states that, before reversing a judgment because of an error of law, the reviewing court must find that the error amounted to such a denial of the appellant's rights as was reasonably calculated to

17

cause and probably did cause "the rendition of an improper judgment," or that the error "probably prevented the appellant from properly presenting the case [on appeal]." *G & H Towing Co. v. Magee*, 347 S.W.3d 293, 297 (Tex. 2011) (alteration in original) (quoting TEX. R. APP. P. 44.1(a)); *see Harris*, 2018 WL 3233329, at *4.

"The [harmless error] rule applies to all errors." *Magee*, 347 S.W.3d at 297. And it is the complaining party's burden to show harm on appeal. *Harris*, 2018 WL 3233329, at *4; *see Ford Motor Co. v. Castillo*, 279 S.W.3d 656, 667 (Tex. 2009).

Scherer contends that the trial court's error in refusing to apply French law to his claims resulted in harmful error. Specifically, he contends that the error was harmful because it resulted in the trial court's refusal of his proposed French-law jury questions, which, he claims, probably caused the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1(a). We disagree that any error by the trial in refusing to apply French law to Scherer's claims was harmful. But to understand why, a more detailed look at the procedural background of the dispute and a discussion of the legal principles related to it are required.

**B.     Harmless Error Analysis**

In the "Breach of Contract" and "Breach of Warranties" sections of his live pleading, Scherer asserted claims against TCY and FP not only under Texas law, but also under provisions of the French Civil Code and French Consumer Code (the French Code). Scherer alleged that he was entitled to sue TCY and FP for violating

three different "legal guarantees" established by the French Code: (1) the legal guarantee of conformity; (2) the legal guarantee for hidden defects; and (3) the commercial guarantee.

Pursuant to Rule of Evidence 203, Scherer filed a request for the trial court to take judicial notice of the French Code provisions containing these legal guarantees. Included with his request, Scherer asked the trial court to apply the French-law provisions to his claims. "[U]nder a conflict-of-laws analysis, and under Texas law, the party asserting that another state's law applies bears the burden (a) to show that the law of Texas conflicts with the other state's law, and (b) to demonstrate which law should apply based on state contacts to the asserted claims." *Klinek v. LuxeYard, Inc.*, 596 S.W.3d 437, 450 n.9 (Tex. App.—Houston [14th Dist.] 2020, pet. denied); *see Grizzly Mountain Aviation, Inc. v. Honeywell Int'l, Inc.*, No. 13-11-00676-CV, 2013 WL 5676069, at *2 (Tex. App.—Corpus Christi Oct. 17, 2013, no pet.) (mem. op.) ("The party requesting application of a foreign law has the initial burden of showing that the foreign law conflicts with Texas law.").

To support his request regarding French law, Scherer filed the affidavit and deposition testimony of Tomas Rouhette, a French attorney. Rouhette testified that, "[u]nder French law, the buyer of goods has three different guarantees resulting from the sales agreement: [1] a legal guarantee of conformity of the goods to the contract; [2] a legal guarantee for hidden vices/defects; and [3] a commercial guarantee"—

19

the same three legal guarantees asserted by Scherer. He opined that, "in this particular case, [Scherer] can benefit from the three aforementioned guarantees."

Relevant to Scherer's claims, Rouhette described the legal guarantee of conformity as requiring the seller "to deliver a product that fully complies with what can be expected for the type of product at stake." He testified that the legal guarantee also requires that the product must fully comply with the sales contract for the goods when "a detailed contract" has been signed. Rouhette explained that, when there is a signed, detailed contract, "the seller will be held liable when the goods delivered do not comply with the contractual specifications agreed between the parties." [3]

Rouhette also testified about the legal guarantee for hidden defects. He explained that the legal guarantee for hidden defects binds a seller "to a warranty against hidden defects in the thing sold that render it unfit for its intended use, or

---

[3]   Regarding the legal guarantee of conformity, Rouhette indicated that, when there is no detailed written contract, the product must fully comply with "promises made by the seller." On appeal, Scherer implies that his legal-guarantee-of-conformity claim was based, in part, on the theory that FP and TCY failed to comply with "promises made by the seller" because the Purchase Agreement was not sufficiently "detailed." However, this assertion is not supported by the record. In his live pleading, Scherer alleged that FP and TCY violated the legal guarantee of conformity by asserting that "[t]he goods delivered to Scherer did not fully comply with the [written] sales contract." In his proposed liability question for submission to the jury, Scherer defined the "French legal guarantee of conformity" to mean that "the seller of a product is required to deliver a product that fully complies with what can reasonably be expected for the type of product in question or the promises made in the Sales Agreement." The record does not reflect that he based his claim for violation of the legal guarantee of conformity on "promises made by the seller." Thus, that theory has no relevance to the determination of whether French law should have been applied to his claims.

that so impair its use that the buyer would not have bought it, or would only have given a lesser price for it if he had known of the defects." Under French law, a hidden defect is "a defect that renders the thing unfit for its intended use."

Rouhette further explained that a commercial guarantee "is optional and may be provided by contract." He noted that the general sales agreement between FP and TCY expressly provided for a "contractual guarantee" of the vessel's structure for five years and otherwise for two years "from the date of acceptance of the vessel." He testified that the provision in the agreement qualified as "a commercial guarantee" enforceable under French law.

Rouhette's testimony also revealed that—unlike Texas law, which provides for the disclaimer of implied warranties—French law prohibits the disclaimer of implied guarantees. *See* TEX. BUS. & COM. CODE § 2.316(b) (setting out requirements for disclaiming implied warranties of merchantability and fitness). His testimony also revealed that French law permits damages for breaching legal guarantees not permitted under Texas law for breach of contract or breach of warranty. Specifically, Rouhette testified that French law permits recovery of "moral damages" for the breach of the implied legal guarantees. He described "moral damages" as "those damages which affect extra-pecuniary and non-economic interests of a person," such as emotional damages. *Cf. Latham v. Castillo*, 972 S.W.2d 66, 71 (Tex. 1998) (recognizing that mental anguish damages are not

21

recoverable for breach of contract); *Polaris Indus., Inc. v. McDonald*, 119 S.W.3d 331, 336 (Tex. App.—Tyler 2003, no pet.) ("In an action for breach of the implied warranty of merchantability, the plaintiff can recover actual damages.").

FP and TCY each filed briefing in the trial court opposing the application of French law. FP asserted that Scherer had "failed to demonstrate a difference between . . . Texas law and [the] French guarantees [he sought] to have applied." FP correctly noted that, "[w]ithout a true conflict of law, Texas courts will not undertake an analysis of choice-of-law provisions, as the outcome of the case would be no different." *See Compaq Computer Corp. v. Lapray*, 135 S.W.3d 657, 672 (Tex. 2004) (recognizing "there can be no harm in applying Texas law if there is no conflict" between Texas law and law of other jurisdiction sought to be applied).

FP asserted that, based on Rouhette's description of the three legal guarantees, the applicable French law was "substantially the same as Texas law." First, FP asserted that bringing a claim to enforce the French legal guarantee of conformity for failing to fully comply with a sales contract was like asserting a breach-of-contract claim under Texas law.[4] *See* STATE BAR OF TEXAS, TEXAS PATTERN JURY

---

[4]    As mentioned, Rouhette also testified that the legal guarantee of conformity requires the seller "to deliver a product that fully complies with what can be expected for the type of product at stake." This requirement is materially similar to the implied warranty of merchantability, which we discuss below. *See* TEX. BUS. & COM. CODE § 2.314(b)(3) (providing that, to be merchantable, goods must be "fit for the ordinary purposes for which such goods are used").

CHARGES: BUSINESS, CONSUMER, INSURANCE, & EMPLOYMENT PJC 101.2 (2018) (containing following Pattern Jury Charge for breach-of-contract claim: "Did *Don Davis* fail to comply with *the agreement*?").

FP next pointed out that "[w]hat Rouhette describes as a 'legal guarantee' of hidden defects' does not differ from Texas law as to the implied warranties of merchantability and fitness for a particular purpose" under sections 2.314 and 2.315 of the Texas Business and Commerce Code. Section 2.314 sets out the requirements for the implied warranty of merchantability, providing that, "[u]nless excluded or modified . . . , a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." TEX. BUS. & COM. CODE § 2.314. To be merchantable, goods must, inter alia, be "fit for the ordinary purposes for which such goods are used." *Id.* § 2.314(b)(3). And, regarding the implied warranty of fitness for a particular purpose, section 2.315 provides,

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is[,] unless excluded or modified under the next section[,] an implied warranty that the goods shall be fit for such purpose.

*Id.* § 2.315. Finally, FP asserted that "[w]hat Rouhette describes as a 'commercial guarantee' does not differ from Texas law as to an express warranty" under Business and Commerce Code section 2.313. That section provides, in relevant part, that "[a]ny affirmation of fact or promise made by the seller to the buyer which relates

23

to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." *Id.* § 2.313(a)(1).

At the pre-trial conference, the trial court heard the parties' arguments regarding the application of French law. Scherer asserted that French law and Texas law conflicted, noting that Texas law did not permit the recovery of moral damages but French law did. After trial began, the trial court ruled that French law would not apply to Scherer's claims. On the record, the trial court indicated that one reason for its ruling was its finding that there was "not a significant conflict between the laws of France and the laws of Texas." The court also stated that, "while French law calls their guarantees one thing" and "Texas may call it another" the laws of the two jurisdictions are "substantially similar."

Later, at the charge conference, Scherer offered a proposed French-law liability question. The question asked whether TCY and FP had failed to comply with guarantees under French law, specifically, the legal guarantee of conformity, the legal guarantee against hidden defects, and commercial guarantee. The definitions accompanying the proposed question defined each guarantee in accordance with how Rouhette had described the guarantees in his testimony. Scherer also offered a proposed damages question containing the types of damages—including moral damages—permitted by French law. The question was

predicated on the jury answering "yes" to the liability question. The trial court marked Scherer's French-law questions "refused."

Although Scherer pleaded separate causes of action for breach of implied and express warranties under Texas law and for violation of the Magnuson–Moss Warranty Act under federal law, the parties agreed that only one question should be submitted to the jury for all Scherer's breach-of-warranty causes of action—both state and federal. At the charge conference, Scherer's attorney explained that "[s]ubstantivley, the warranty concepts are the same" for the Texas-law warranty claims and the Magnuson–Moss Warranty Act claim.[5] The parties indicated that submitting two separate questions—one for the Texas warranty claims and one for the Magnuson–Moss Warranty Act—might confuse the jury and ran the risk of inconsistent answers to the questions.

The single question submitted to the jury for the warranty claims—Question 3—asked, "Was the failure, if any, of TCY or FP to comply with a warranty or the Magnuson-Moss Warranty Act a producing cause of damages to Scherer?" The trial court instructed the jury that failure to comply with the Magnuson–Moss Warranty

---

[5]   The Magnuson–Moss Warranty Act, 15 U.S.C. §§ 2301–2312, "regulates written warranties and provides a private right of action by consumers against manufacturers or retailers who fail to comply with written warranties or implied warranties," *Polaris Indus., Inc. v. McDonald*, 119 S.W.3d 331, 337 (Tex. App.—Tyler 2003, no pet.). "[T]he the Act specifically provides that state law determines whether or not an implied warranty exists." *Id.* (citing 15 U.S.C. § 2301(7)).

Act meant failing to comply with the implied warranty of fitness for a particular purpose, the implied warranty of merchantability, or an express warranty.[6] The charge defined those warranties in accordance with Business and Commerce Code section 2.313 (express warranty), section 2.314 (implied warranty of merchantability), and section 2.315 (implied warranty of fitness for particular purpose), as discussed above. The jury answered Question 3 "no" for FP and TCY.

Question 4 asked the jury: "Did TCY clearly and conspicuously disclaim any written or implied warranties in its Purchase Agreement with Scherer?" But, because Question 4 was predicated on an affirmative response to Question 3, the jury did not answer Question 4 about the disclaimer of warranties. The jury also did not answer the damages question predicated on an affirmative response to Question 3.

On appeal, Scherer asserts that the trial court erred in denying his request to apply French law because, according to him, the trial court incorrectly based its denial, in part, on its determination that there was "not a significant conflict between the laws of France and the laws of Texas" and that the laws were "substantially similar." Scherer contends that there are material differences between Texas law governing warranties and French law governing legal guarantees.

---

[6]     The charge did not expressly identify the three warranties by name but provided a description of the warranties that correspond with how the warranties are defined in the Business and Commerce Code.

Regarding the liability aspect of the laws, Scherer asserts that the French legal guarantee for hidden defects contains a provision that is materially different from Texas law. Rouhette testified that the French Code provides, "The seller is bound to a warranty against hidden defects in the thing sold that render it unfit for its intended use, *or that so impair its use that the buyer would not have bought it, or would only have given a lesser price for it if he had known of the defects*." (Emphasis added.) Scherer acknowledges that Texas law provides for an implied warranty of fitness for particular purpose—similar to the legal guarantee of hidden defects as described in the unitalicized portion of Rouhette's testimony—but he also incorrectly contends that Texas law does not contain a provision similar to the italicized portion of Rouhette's testimony.

As mentioned, Business and Commerce Code section 2.314 provides for the implied warranty of merchantability: "Unless excluded or modified . . . , a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." TEX. BUS. & COM. CODE § 2.314. To be merchantable, goods are required to be "fit for the ordinary purposes for which such goods are used." *Id.* § 2.314(b)(3). Thus, requiring a seller to impliedly warrant that a good is merchantable—that is, fit for the ordinary purposes for which it would be used—is not materially different than requiring a seller to be bound to a guarantee

27

against a hidden defect that so impair a good's use that a buyer would not purchase it or would pay less for it.[7] *See id.*

Scherer also cites two aspects of French law regarding legal guarantees that we agree are different than Texas law. He correctly points out that a "difference between French and Texas law is that Texas'[s] implied warranties can be disclaimed, while the French legal guarantees cannot be disclaimed under French law." He also accurately points out that French law permits the recovery of "moral damages," which are "unavailable under Texas law." But, to the extent error could be established based on these two differences in the laws, any error would be harmless.

Scherer contends that he was harmed by the trial court's alleged error of denying his request to apply French law because that error resulted in the trial court's refusal of his proposed French-law liability question, thus preventing him from presenting his French-law claims to the jury. As discussed, the liability elements for his French-law claims are materially the same as the liability elements for his Texas breach-of-warranty and breach-of-contract claims, which were submitted to and rejected by the jury. There is nothing in the record to suggest that, had his proposed

---

[7]    Scherer also asserts that the provision in French law that entitles a buyer to the legal guarantee of conformity based on the promises made by the seller is different than Texas law. But, as discussed in footnote 3, Scherer did not allege a claim for violation of the legal guarantee of conformity based on that theory in the trial court.

28

French-law liability question been submitted to the jury, the liability finding would have been any different. Although Texas law differs from French law regarding the ability to disclaim implied warranties and the type of damages a plaintiff may recover, the jury never reached the questions addressing disclaimer of warranty or damages because those questions were predicated on an affirmative finding of liability. Thus, we hold that any error arising from the trial court's determination that Texas law and French law did not conflict was harmless because the error did not probably cause the rendition of an improper judgment or prevent Scherer from properly presenting his appeal. *See* TEX. R. APP. P. 44.1(a).

We further note that once a court determines that a conflict exists between the law of two jurisdictions, the next step is to determine which law applies. *See Sonat Exploration Co. v. Cudd Pressure Control, Inc.*, 271 S.W.3d 228, 231 (Tex. 2008). Texas choice-of-law rules governing contracts follow the Restatement (Second) of Conflict of Laws. *Id.* Restatement section 187 applies to contracts in which the parties expressly chose the law to apply, and section 188 applies to contracts in which the parties did not make an effective choice of law. *Id.*; *see* RESTATEMENT (SECOND) OF CONFLICT OF LAWS §§ 187, 188. Under section 188(1), a contract is governed by the law of the State that has the "most significant relationship" to the transaction in light of the general choice of law principals set out in section 6 of the Restatement. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188(1).

On appeal, Scherer does not contend that the parties selected France as the law to apply, nor does he contend that France had the most significant relationship to the transaction. Instead, he claims that, because the trial court incorrectly determined that there was no conflict between French law and Texas law, the trial court also failed to engage in the next step of the choice-of-law analysis to determine which law applied. However, the record does not support Scherer's claim.

In the trial court, FP and TCY each asserted in their briefing that Texas, not France, had the most significant relationship to the transaction. When it denied Scherer's request to apply French law, the trial court indicated that it denied the request not only because the laws were "significantly similar" but also because the "the State of Texas is the jurisdiction with the most significant relationship."

Generally, to obtain reversal on appeal, an appellant must attack all independent bases or grounds that fully support a complained-of ruling or judgment. *Britton v. Tex. Dep't of Criminal Justice*, 95 S.W.3d 676, 681 (Tex. App.—Houston [1st Dist.] 2002, no pet.). If an independent ground fully supports the complained-of ruling or judgment, but the appellant assigns no error to that ground on appeal, "we must accept the validity of that unchallenged independent ground," and "any error in the grounds challenged on appeal is harmless because the unchallenged independent ground fully supports the complained-of ruling or judgment." *Id.* Thus, even if the trial court erred in finding no conflict between the laws of France and

30

Texas, any error is also rendered harmless by Scherer's failure to challenge the trial court's determination that Texas has the most significant relationship to the transaction—an independent basis supporting the trial court's ruling denying Scherer's request to apply French law. *See id.*

We overrule Scherer's second issue.[8]

## Disclaimer of Reliance

A party to a transaction may contractually agree to waive reliance on another party's statements. *See Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 332 (Tex. 2011). But, to disclaim reliance, the disclaimer language must be "clear and unequivocal." *Id.* at 336.

In the Purchase Agreement, Scherer agreed: "I am not relying on any representations by the dealer [TCY], its agents, salespersons, or employees in

---

[8] In his brief, Scherer also states that the trial court erred by "not allowing testimony to the jury on the French law questions." In one sentence, he points out that he "made bills of exceptions of the French law questions specifically, which show additional testimony and evidence supporting [his] claims under French law, which the jury was not allowed to hear or see." While Scherer provides record citations to his bills of exception, Scherer offers no argument or substantive analysis regarding the claimed error. *See* TEX. R. APP. P. 38.1(i) (requiring that appellant's brief "contain a clear and concise argument for the contentions made . . . ."); *Huey v. Huey*, 200 S.W.3d 851, 854 (Tex. App.—Dallas 2006, no pet.) ("We have no duty to brief appellant's issue for [him]. Failure to cite to applicable authority or provide substantive analysis waives an issue on appeal."). Thus, to the extent Scherer is attempting to raise the evidentiary complaint as an additional sub-point of error, he has waived it. And, in any event, because we have determined that any error in the trial court's ruling denying Scherer's request to pursue his claims under French law was harmless, we fail to see how any error in failing to present French-law evidence to the jury was also not harmless. *See* TEX. R. APP. P. 44.1(a).

purchasing the yacht. I have had ample opportunity to investigate the purchase of the yacht and have arrived at my own conclusion whether I should buy it." Similar clauses have been referred to as "disclaimers of reliance." *Pogue v. Williamson*, 605 S.W.3d 656, 666 (Tex. App.—Houston [1st Dist.] 2020, no pet.).

Question 9 in the jury charge asked: "Did the Purchase Agreement between TCY and Scherer clearly and unequivocally expresses [sic] the parties' intent to disclaim reliance?" The jury answered "yes." Question 10 asked: "Did TCY or FP make a negligent misrepresentation on which Scherer justifiably relied?" The charge instructed the jury that, if it answered "yes" to Question 9, then it should answer Question 10 "as to FP only." Because it answered Question 9 affirmatively, the jury did not answer Question 10 as to TCY, but it did answer the question as to FP, finding that FP had not made a negligent misrepresentation on which Scherer justifiably relied.

### 1. Clear and Unequivocal

In his third issue, Scherer contends that the jury should not have determined whether the Purchase Agreement "clearly and unequivocally expresse[d] the parties' intent to disclaim reliance because it is a question of law for the court to decide."[9]

---

[9] In a restatement of his issue in his brief, Scherer also poses as a question: "Did the trial court err . . . in allowing testimony and argument that [the Purchase Agreement] did contain an adequate disclaimer?" Scherer never answers this question, nor does he provide any argument, analysis, authority, or record citations to the extent that he is suggesting that the trial court erred "in allowing testimony and argument"

The Supreme Court of Texas has stated, "The question of whether an adequate disclaimer of reliance exists is a matter of law." *Italian Cowboy*, 341 S.W.3d at 333. It is elemental that juries decide fact questions, and courts decide law questions.[10] *See Chitsey v. Nat'l Lloyds Ins. Co.*, 738 S.W.2d 641, 643 (Tex. 1987) ("A jury's role is to decide matters of fact and not matters of law."). Thus, we agree with Scherer that it was error for the trial court to submit the issue to the jury, and the finding may be disregarded as immaterial. *See Spencer v. Eagle Star Ins. Co. of Am.*,

---

regarding the disclaimer-of-reliance clause. *See* TEX. R. APP. P. 38.1(i); *Huey*, 200 S.W.3d at 854. Thus, even assuming Scherer intended his question to present a separate sub-point of error, the complaint is waived for inadequate briefing. *See* TEX. R. APP. P. 38.1(i).

[10]  TCY asserts that Scherer did not preserve his complaint regarding the submission of the disclaimer-of-reliance issue in Question 9 because he did not object to the submission until his motion for new trial. TCY correctly points out that a party must object to the charge before it is read to the jury. *See* TEX. R. CIV. P. 272, 274 ("Any complaints to a question, definition or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections."); *Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 829 (Tex. 2012) ("Our procedural rules state that a complaint to a jury charge is waived unless specifically included in an objection."). However, the Supreme Court of Texas has held that a complaint on appeal asserting that a jury's answer is immaterial— because the jury answered a question of law—is not jury charge error. *See Musallam v. Ali*, 560 S.W.3d 636, 640 (Tex. 2018). "Accordingly, a party need not object to a jury question to later argue that it is immaterial." *Id.* Error is preserved on an immateriality complaint by raising it in a post-verdict motion, such as a motion for new trial. *See BP Am. Prod. Co. v. Red Deer Res., LLC*, 526 S.W.3d 389, 402 (Tex. 2017) ("BP preserved error on the immateriality issue by raising these concerns post-verdict in a motion for judgment in disregard, in a motion for judgment notwithstanding the verdict, and in a motion for new trial."). Because he raised his complaint regarding the submission of a question of law to the jury in his motion for new trial, Scherer preserved the issue for appeal. *See Musallam*, 560 S.W.3d at 640; *Red Deer Res.*, 526 S.W.3d at 402.

33

876 S.W.2d 154, 157 (Tex. 1994) (holding that "[a] question which calls for a finding beyond the province of the jury, such as a question of law, may be deemed immaterial" and that immaterial jury finding may be disregarded).

As mentioned, the harmless error rule applies to all errors. *Magee*, 347 S.W.3d at 297. Here, if the jury correctly found that the disclaimer of reliance was clear and unequivocal, then the error was harmless. *See Hutch Aviation, Inc. v. Teal*, No. 12-19-00001-CV, 2019 WL 5258068, at *5 n.3 (Tex. App.—Tyler Oct. 17, 2019, pet. denied) (mem. op.) ("[T]he submission of a question of law to the jury is usually harmless; either no harm results because the jury answers the question correctly or the trial court can disregard the answer as immaterial if answered incorrectly.") (citing *Hudson Buick, Pontiac, GMC Truck Co. v. Gooch*, 7 S.W.3d 191, 195 (Tex. App.—Tyler 1999, pet. denied)).

In the Purchase Agreement, Scherer specifically agreed that he was "not relying on any representations by the dealer [TCY], its agents, salespersons, or employees in purchasing the yacht." He further agreed that he "had ample opportunity to investigate the purchase of the yacht and [had] arrived at [his] own conclusion whether [he] should buy it."

The Supreme Court of Texas has held that contractual language similar to the Purchase Agreement's language was a clear and unequivocal disclaimer of reliance. *See Int'l Bus. Machines Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 228–29, 232–

34

33 (holding that provisions stating that, in entering into contract, party "is not relying upon any representation made by or on behalf of IBM that is not specified in the Agreement" and that parties are not "relying upon any representation that is not specified" in contract, clearly and unequivocally stated that parties were not relying upon representations other than those stated in contract); *Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 59–61 (Tex. 2008) (holding that provision stating that no party is "relying upon any statement or any representation of any agent of the parties" refuted element of reliance in fraudulent-inducement claim); *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d. 171, 180–81 (Tex. 1997) (holding that contractual language stating that "none of us is relying upon any statement or representation of any agent of the parties being released hereby" and "[e]ach of us is relying on his or her own judgment" was clear and unequivocal disclaimer of reliance on representations).

In accordance with the holdings of the supreme court, we conclude that the disclaimer of reliance in the Purchase Agreement was clear and unequivocal. Thus, the jury correctly answered Question 9, rendering the error of submitting the question to the jury harmless. *See* TEX. R. APP. P. 44.1(a).

We overrule Scherer's third issue.

## 2. Surrounding Circumstances

Not only must a disclaimer of reliance be clear and unequivocal, but courts must also examine the totality of the circumstances surrounding the formation of the contract to determine if the disclaimer is binding. *Lufkin Indus., LLC*, 573 S.W.3d at 229. In examining the surrounding circumstances, courts must consider whether

> (1) the terms of the contract were negotiated, rather than boilerplate, and during negotiations the parties specifically discussed the issue which has become the topic of the subsequent dispute;
>
> (2) the complaining party was represented by counsel;
>
> (3) the parties dealt with each other at arm's length; and
>
> (4) the parties were knowledgeable in business matters.

*Id.* (citing *Italian Cowboy*, 341 S.W.3d at 337 n.8).

These factors were not submitted to the jury in Question 9. Thus, Scherer does not complain that the jury improperly applied these factors to determine whether the disclaimer-of-warranty clause was binding, which, as discussed, is a question of law. *See Italian Cowboy*, 341 S.W.3d at 333. Instead, in his fourth issue, Scherer asserts: "The trial court erred in failing to examine the circumstances of contract formation, which would have demonstrated that the disclaimer of reliance was not binding."

In his brief, Scherer lists the four factors for analyzing the totality of the circumstances surrounding a contract's formation, but beyond listing the factors, he does not offer any analysis, nor does he cite the record from the three-week trial to

36

support his contention that an examination of the factors by the trial court "would have demonstrated that the disclaimer of reliance was not binding." *See* TEX. R. APP. P. 38.1 (requiring brief to contain "clear and concise argument for the contentions made, with appropriate citations to authorities and to the record").

Scherer's briefing inadequacies aside, even if we assume that the trial court erred by not examining the circumstances surrounding the formation of the Purchase Agreement, we conclude that the balance of the factors for examining the circumstances support a determination that the disclaimer of reliance was binding on Scherer. *See Lufkin*, 573 S.W.3d at 229. The record shows that Scherer and TCY negotiated the Purchase Agreement at arm's length with both parties acting in their own self-interest. The Purchase Agreement was a form contract, but key terms such as the Catamaran's price were negotiated. The pricing breakdown and the payment terms were handwritten into the contract and the equipment selected by Scherer was detailed in a separate spreadsheet, showing that key terms were not boilerplate. *See id.* at 229 n.4 ("Lufkin argues that the disclaimers were 'non-negotiated boilerplate' provisions, but the factors do not require that every sentence in a contract be negotiated."). While TCY's owner, Jeff Johnson, told Scherer at the time Scherer signed the Purchase Agreement that the Catamaran was covered by FP's warranty and that TCY was the service provider for the warranty, other representations related

37

to the vessel and to the dispute, such as the vessel's attributes and its seaworthiness, were made primarily in sales information provided to Scherer, pre-negotiation.

Scherer was not represented by counsel during the negotiation, but neither was TCY. Thus, the record does not reveal a disparity in representation between the parties. *See Pogue*, 605 S.W.3d at 667 (noting that neither party was represented by counsel, indicating no disparity) (citing *Lufkin*, 573 S.W.3d at 229 (observing that parties "were both knowledgeable in business matters and represented by counsel" in analyzing enforceability of disclaimer of reliance)).

The record also shows that Scherer was knowledgeable about business matters. Scherer testified that he and a business partner established an oilfield services company in 1982 of which he was a principal. The record further showed that, before he purchased the Helia Catamaran, Scherer researched sailing catamarans for over a year, including FP catamarans and even more specifically the Helia model. Scherer testified that he had attended other boat shows before buying the Catamaran and had met with another FP dealer in Miami several times. He had discussed the Helia model with the Miami dealer and had looked at the model at that dealership. Clark testified that, when he met Scherer at the Annapolis boat show, Scherer was more knowledgeable about catamarans than he was. And, finally, as discussed, the Purchase Agreement clearly disclaimed reliance. *See Lufkin*, 573 S.W.3d at 229.

We conclude that a balance of the factors for examining the circumstances surrounding the Purchase Agreement's formation show that the disclaimer of reliance clause was binding on Scherer. *See id.* Thus, any error by the trial court in not analyzing the surrounding circumstances was harmless. *See* TEX. R. APP. P. 44.1(a).

We overrule Scherer's fourth issue.

**Conclusion**

We affirm the judgment of the trial court.[11]

Richard Hightower
Justice

Panel consists of Justices Landau, Hightower, and Rivas-Molloy.

---

[11] On January 12, 2021, FP and TCY filed a motion to dismiss Scherer's appeal for want of prosecution because Scherer had not filed his brief by the ordered briefing deadline. They pointed out that Scherer had filed several motions for extensions of time to file his brief, which were granted. Two days after the motion to dismiss was filed, Scherer filed his brief on January 14, 2021. Accordingly, we deny the motion to dismiss.